THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RODNEY GROSS, Defendant-Appellant.

Third District   No. 77-321

Opinion filed August 21, 1979.

STOUDER, P. J., dissenting.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Keefe, State's Attorney, of Rock Island (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Rodney Gross appeals from a conviction of rape and murder of Della Masengarb (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1(a)(1) and 9—1(a)(2), and 11—1). Defendant was found guilty by a jury and was sentenced to a term of imprisonment of 75 to 100 years.

The record discloses that the nude body of Della Masengarb, with multiple stab wounds, was found in the living room of her Rock Island apartment at 3 p.m. on August 28, 1976, by a police detective. The woman, who was in her mid-twenties, had died 12 to 15 hours earlier as a result of one or more of the stab wounds. Following the discovery of the body, the police also found a one-year-old boy and a four-year-old girl in one of the bedrooms of the Masengarb apartment. The boy was in a crib and the girl was in bed, under the covers. As the officers entered the room, the girl, appearing to be frightened, raised the covers and peeked over the

top. In response to a policeman's questions, she stated her name; with whom she lived; that her father was in jail; and that "Rodney" had been there "last night."

Prior to trial, counsel for defendant made a motion *in limine* asking the court to rule out the out-of-court statement made by the four-year-old girl as an inadmissible hearsay statement. The court denied the motion, and ruled that the statement was admissible under the spontaneous declaration exception. *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310.

In support of the State's position on the issue of admission of the statement of the four-year-old child, as a spontaneous declaration exception, the State points out, as stated in *People v. Parisie*, referred to, that:

> "It is not the *time element* that controls, but the existence or lack of spontaneity in the light of the surrounding circumstances that is determinative." (*Parisie*, 5 Ill. App. 3d 1009, 1028.)

The State asserted that, in the instant case, the response was made to questions from the police officer by the four-year-old child, who was obviously frightened, but who answered clearly when asked about her name; who lived on the premises; where her father was; and, when asked who else was there (besides her mother, the four-year-old and her baby brother), she responded "Rodney," and, also, answered a specific question, when asked when Rodney had been there, by replying "last night."

The appellee contends that in determining the admissibility of a declaration of this character by the child, which indicated the presence of "Rodney," many factors justify the admission of such statement by the court, as an exception to the hearsay rule. It is pointed out that the child was only a four-year-old who was frightened. It is clear that the child's statement was obviously spontaneous and could hardly have been calculated by the little child for any purpose, according to the appellee, other than to answer specifically the questions put to her. The fact, also (it is contended), that the little child is only four years old would render improbable any conclusion that the utterance was deliberate and its effect premeditated. The State points to the statement in *State v. Duncan* (1978), 53 Ohio St. 2d 215, 220, 373 N.E.2d 1234, 1237:

> "[A] review of cases from other jurisdictions, in which excited utterances by infant declarants were offered in evidence as part of the *res gestae*, reveals that several courts have expressly indicated that the strict requirements of the *res gestae* rule should be relaxed or liberalized in favor of the admissibility of such utterances."

Thus, it is contended, that whether the reply of the four-year-old is

deemed a spontaneous declaration or an excited utterance, it serves the ends of justice to follow the liberal approach in favor of admission of what is clearly not a contrived response.

Later, on August 28, 1976, police officers went to the home where defendant lived with the owner, Dean DeBord. The officers obtained permission to search the DeBord house, including the bedroom of his daughter, where defendant had at times slept. The officers found a pair of jeans, which were blood-soaked, in the dirty clothes basket in the daughter's room. They were identified as belonging to the defendant. At 8:20 p.m. on the same day, the defendant, who had known the victim, Della Masengarb, was arrested, read his *Miranda* rights and taken to the Rock Island Police Department. He was interviewed there by police detectives. Defendant told them that shortly after 1 a.m. on August 28, he drove straight home and remained there the rest of the night.

On August 29, as defendant was being taken out of his jail cell, he volunteered to the detectives that he had lied the night before. He stated that he did not go home after 1 a.m. on August 28, but instead, because he was having car trouble, he parked in a Zayre Store parking lot and fell asleep until approximately 6 a.m.

On August 30, defendant, after being informed of his rights, was interrogated by the Assistant State's Attorney Malvik. Malvik sought to obtain the confession of the defendant by confronting the defendant with the evidence. Defendant denied killing Della Masengarb, or being in her house at the time of the killing. Malvik told the defendant that he "knew it was a horrible thing" and that he "was sure that [the person responsible] didn't mean to do it." Malvik testified also that defendant at that point "didn't say anything and then he said 'take me back to my cell.' "

At the trial, Sally Dillon, a supervising criminalist for the Illinois Bureau of Identification, testified for the State that Della Masengarb had a combination of blood types that less than 1% of the population has. She found that same combination of blood types present on the pants belonging to the defendant which the police had recovered from Dean DeBord's house. Sally Dillon stated, on cross-examination, that it was impossible to conclude that the blood on the pants was identical to that of decedent since she could only specify the type of blood, which is a very rare type. Dillon also revealed that defendant's ABO blood type was "O," which is present in approximately 45% of the population. This type of blood was found by Dillon in a fingernail scraping from under the decedent's left thumb. Dillon also microscopically compared hair found on the right little finger of the decedent, with samples of defendant's head hair and with decedent's head hair. The criminalist concluded that the hair found on the decedent's little finger was not similar to that of

decedent but was similar in color and characteristics to defendant's hair. Also, in the test of a bed sheet recovered from the bedroom in decedent's home, Dillon found seminal material and blood.

The defendant attempted to rebut the Dillon testimony with the testimony of a Dr. Arthur Simmons, who was a well-qualified pathologist and hematologist. Dr. Simmons also tested the same blood samples and exhibits testified to by Dillon, but pointed out that the blood had become contaminated and the results were inconclusive, since it had been taken from a decedent approximately 17 hours after the estimated time of her death.

Four inmates who had been in the county jail with defendant prior to or during his trial also testified. Three of the inmates testified for the State, on direct examination, that defendant had admitted killing Della Masengarb. The fourth inmate, who was called to testify in rebuttal, testified that he was asked in September 1976 by a sheriff's department employee, to see if the defendant would say anything and to inform the employee of any statements defendant might make. The fourth inmate testified that, in response to his questioning, defendant said he killed a woman with a knife.

The State also presented two witnesses who testified about two extra-indictment crimes defendant had allegedly committed. Twenty-year-old Sherry McCarthy testified that around June 11, 1975, at approximately 2 a.m., defendant broke into her home while she was sleeping, grabbed a ceramic statue and told her to be quiet or he would bash her head in. Defendant then raped McCarthy and forced her to perform a deviate sexual act. Before his departure, defendant warned McCarthy not to tell anyone or he would come back and kill her. McCarthy did not know defendant prior to the incident but observed him earlier in the day across the alley from her house. She reported the incident to the police at that time but the State's Attorney refused to authorize the issuance of a "warrant," she said.

The second witness, 17-year-old Kathryn Gotthardt, testified that at 3 or 4 a.m. on April 13, 1976, defendant broke into her home and entered her bedroom. Defendant held a knife to her throat and said he wanted to talk. The young woman screamed and her parents came into the room, at which time defendant left the house. Gotthardt had known defendant since January 1976, and had gone out with him once prior to the assault. She had also lived for a few days in an apartment with defendant and Don Garrett.

Defendant's counsel made a second motion in limine prior to trial, asking that the State be barred from introducing evidence of two extra-indictment crimes allegedly committed by defendant. The court denied

this motion, ruling that the evidence of other crimes was admissible to show *modus operandi.*

Defendant testified in his own behalf and denied that he killed or raped Della Masengarb. On cross-examination, the prosecutor asked defendant numerous times whether certain witnesses, whose testimony conflicted with defendant's, were lying or mistaken. The first such question posed to defendant was objected to and the court sustained the objection. Defense attorney, however, failed to object to any of the other questions asked of defendant of the same nature.

On appeal in this court, defendant contends (1) that defendant was denied a fair trial and due process by the denial of his motion *in limine* and subsequent introduction into evidence of other crimes in the trial; (2) that the court erred in instructing the jury to consider the other crime evidence on the issues of identification, presence, intent, motive and design; (3) that the trial court erred in admitting into evidence, as a spontaneous declaration, the out-of-court statement by the four-year-old child of the victim, made more than 12 hours after the occurrence; (4) that the trial court erred in allowing defendant to be cross-examined on the truthfulness of other witnesses, whose testimony conflicted with defendant's and defendant contended he did not waive this error by not objecting at trial and not including it in his post-trial motion; and (5) that the trial court erred in allowing evidence of defendant's silence in response to a question to be admitted into evidence and contended that defendant did not waive this objection.

The State responds that any possible error with regard to the matters referred to by defendant was either waived or harmless or does not operate to negate the positive and clear evidence of defendant's guilt as presented in the course of the trial. We agree with the State that if we were to concede that the matters specified by defendant were improper or erroneous, the record still shows clear evidence of the defendant's guilt. Defendant's blood-soaked jeans, which were found in the dirty clothes basket in a room in which defendant often slept, showed that the jeans had blood of the rare type found to be the type of blood of the decedent Della Masengarb. Defendant offered no explanation for the blood on the pants, even though he testified in the case. The expert found decedent's blood type, which is found in less than 1% of the population, on the jeans, and also found defendant's blood type in scrapings from decedent's fingernail. The expert also determined that the hair found under decedent's fingernail was similar to the defendant's hair. There was also seminal material on the decedent's bloody sheet.

We note also that defendant first told police he had driven home shortly after 1 a.m. on the night of the murder. He later changed his story,

stating that he parked in a Zayre Store parking lot because of car trouble and fell asleep there until approximately 6 a.m.

Finally, three county jail inmates testified clearly that defendant had admitted to them that he killed the decedent Masengarb and another inmate testified that defendant said he killed a woman with a knife. Their testimony was challenged only by defendant's denial.

With evidence of the character presented in this cause, the evidence of guilt outweighs the prejudicial effect of errors assigned by defendant. We do not believe, even considering that respective errors referred to and charged by defendant to exist in this case, that any other verdict would have been returned by the jury if such evidence objected to was not present in the cause. As.stated by the Illinois Supreme Court in *People v. Morehead* (1970), 45 Ill. 2d 326, 332:

> "It is not the policy of this court to reverse a judgment of conviction merely because error was committed unless it appears that real justice has been denied or that the finding of guilty may have resulted from such error."

It is clear that the evidence of defendant's admission of guilt and the corroborating evidence from defendant's bloody jeans which was presented in the instant case were adequate, without more, to support the finding of guilt as to defendant. It is also apparent from the record, as noted in the recital of the facts, that the finding of guilt resulted, not from potential errors charged by defendant, but rather from the evidence of the confession and the bloody jeans. It is apparent, consequently, that real justice was not denied to defendant.

.For the reasons outlined in this opinion, the judgment of the Circuit Court of Rock Island County is affirmed.

Affirmed.

BARRY, J., concurs.

Mr. PRESIDING JUSTICE STOUDER, dissenting:

I respectfully dissent from the opinion of my colleagues. As will appear, the evidence of defendant's guilt was neither so clear nor so convincing as to justify disregarding the serious errors that occurred at trial. Considering the conflicting nature of the evidence as a whole, the erroneous admission of the hearsay statements of the four-year-old girl, the evidence of other crimes, as well as other errors, requires a new trial.

The gist of the majority's opinion is that certain evidence was never refuted and because it overwhelmingly established defendant's guilt, any errors which occurred were of no consequence. I cannot agree, but to the contrary, I believe examination of the record reveals every major aspect

of the State's case was challenged in some way by competent evidence favorable to the defense. With the evidence in conflict, matters of credibility were of vital importance at trial, and the jury was faced with the unenviable task of sorting through a myriad of stories to ascertain the truth. Yet, the credibility of defense witnesses was undermined by the improper admission of evidence of other crimes and the hearsay statement of the young girl. Whenever credibility is of such importance it is impossible for any court to gauge the extent to which the jury's deliberations were improperly influenced by errors in admitting evidence. The majority relies on the evidence of blood types and the jailhouse admissions to support their conclusion. I believe such evidence, as well as the other evidence at trial, was conflicting.

At trial, a criminalist from the Illinois Bureau of Investigation, Sally Dillon, testified at length as to the blood type of the deceased victim, the blood type of the defendant and the blood type of two other individuals. According to the criminalist, the victim's ABO blood grouping was found to be type AB. During Dillon's testimony, Dr. Arthur Simmons, who had previously examined the physical evidence, was allowed to be present. Simmons is a professor of pathology at Drake University, a consultant to the Royal Canadian Mounted Police and had Ph.D. degrees in hematology and emunology (blood grouping).

In rebuttal to the testimony of the criminalist, Simmons testified at length to serious deficiencies in various procedures utilized by the State's criminalist in determining blood types. In particular, Simmons testified that certain bacterial contamination of a decedent's blood can occur approximately 15 hours after death and such contamination could cause the ABO blood grouping to type AB regardless of the true blood type. The blood sample from the victim was taken approximately 17 hours after death. When Simmons tested the victim's blood sample several months after her death, he found the contaminating bacteria present. According to Simmons, the only possible way to verify the accuracy of a blood type under such circumstances was to obtain a culture from the victim's blood and thereby determine the presence or absence of the contaminating bacteria at the time the blood type was determined. Since the State criminalist failed to do so, Simmons stated that any conclusions were unsupportable from the tests performed. Further doubt as to the victim's ABO blood type resulted from the criminalist failing to run a test using anti-AB serum, which according to Simmons, was essential to accurately type AB blood.

The majority also relies on the admissions defendant is alleged to have made to various inmates of the county jail. One such admission is alleged to have been made to a friend of the victim's husband who admittedly became so incensed at finding out what the defendant was

charged with that he attacked the defendant. Prior to the alleged admission, the witness, who was incarcerated only during the evening hours, spent four hours in the detention cell because he was intoxicated when he reported to the jail. The other admissions were either controverted by witnesses present during the conversation or were impeached on cross-examination.

An issue at trial was whether the defendant was wearing the pair of jeans alleged to contain the decedent's blood on the evening of the offense. The jeans had distinguishing patches on them. The State presented witnesses who claimed defendant was wearing the jeans and the defendant presented various witnesses who contradicted the State's witnesses. Many of the witnesses on the issue for both parties were impeached to varying degrees, thereby enhancing the importance of the jury deciding the case in a setting free from error. Without relating all the evidence of a lengthy record in detail, suffice it to state I believe the evidence on other important issues was equally conflicting. The foregoing discussion of the various aspects of the evidence is not intended to suggest that defendant could not be found guilty of the offense charged, but rather to emphasize that the majority of the evidence introduced by the State was contradicted or challenged by the defendant. Such a tit for tat exchange of evidence does not suggest a clear and convincing character sufficient to overcome the serious trial errors that occurred. What has been previously said assumes the existence of trial errors. I believe the introduction of the four-year-old's statement, and the evidence of other crimes constitutes such grievous errors.

As to the testimony of McCarthy and Gotthardt, the victims of the two extra-indictment crimes, the well-established rule is that evidence of the commission of other crimes by an accused in support of the crime charged is inadmissible, as well as sufficiently prejudicial to constitute reversible error. (*People v. Gleason* (1962), 36 Ill. App. 2d 15, 183 N.E.2d 523.) An exception to this general rule allows admission of evidence of other crimes when it goes to show motive, intent, identity, absence of mistake, or *modus operandi*. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) I cannot agree with the State's contention that the testimony in question was admissible under the *modus operandi* exception.

To constitute evidence admissible under the *modus operandi* exception the other crimes must have "peculiar and distinctive features common to" that of the offense charged. (*People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506.) The evidence must establish that the crimes are "so nearly identical in method as to earmark them as the handiwork of the accused." (*People v. Osborn* (1977), 53 Ill. App. 3d 312, 320, 368 N.E.2d 608, 615; McCormick, Evidence §190, at 449 (2d ed. 1972).)

Contrary to the position of the trial court and the State on appeal, the other crimes' evidence does not possess such necessary characteristics as to constitute evidence of *modus operandi*.

The occurrence involving McCarthy happened some 13 months prior to the charged offense and the police were unwilling to act upon her complaint. The weapon used was a ceramic vase. The complainant saw the attacker only once previously, which was earlier in the day of the attack.

The aggravated assault against Gotthardt occurred four months before the charged offense. Gotthardt was well acquainted with the defendant and according to one witness, she had previously had voluntary sexual intercourse with defendant. While the assault was made with a knife, no question of sex ever arose.

In the crime charged, defendant was a mere acquaintance of the victim through her husband. The only similarities between the crimes is that the victims were all young women who were attacked at home in the early morning hours in the same metropolitan area. Such similarities are hardly so peculiar or distinctive as to earmark all three crimes as the handiwork of the accused. Comparison of the facts surrounding each offense reveals that if anything, dissimilarities between the three crimes predominate. Such evidence of three crimes removed from one another both in time and character improperly imposed on the defendant the onerous burden of defending three independent and unrelated crimes where only one was charged. When such a situation occurs in a trial where the evidence is conflicting, the defendant's propensity to commit crimes tends to become a focus of the jury's deliberation. Such denies the defendant a fair opportunity to have an impartial jury determine his guilt beyond a reasonable doubt.

The error of admitting the other crimes' evidence was aggravated in this instance by the trial court's erroneous admission of the hearsay statement of the victim's four-year-old daughter. While the trial court allowed the evidence in as a spontaneous declaration and as part of the res gestae, use of res gestae in this situation is wholly inappropriate and may actually inhibit reasonable analysis. (See *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) The State on appeal has abandoned any claim of res gestae and such a position would seem appropriate in light of *Poland*.

No Illinois case has been called to our attention, nor am I aware of any case which has allowed into evidence as a spontaneous declaration the hearsay statement made more than two hours after the crime occurred. The statement in this case occurred approximately 12 hours after the crime.

During the trial, Officer Wittmer testified over defendant's objection to his first encounter with Vicky Masengarb, the four-year-old daughter

of the victim. The following colloquy took place some time after uniformed police officers had arrived at the scene.

"Q. What did the little girl do?

A. She raised the covers up. She had a cover over her and raised it up so that she could peek over the top.

Q. Where was she at?

A. In the bed.

Q. What did you do?

A. I asked what her name was.

Q. How did she appear to you at that time?

A. She was scared of me.

Q. You didn't know the little girl?

A. No.

Q. What happened then when you asked that question?

A. She lowered the covers just enough to talk.

Q. What did she say?

\* \* \*

A. I asked her her name and she said Vicky.

Q. Did you ask her anything else?

A. I asked her who lived here with her.

Q. What did she say?

A. She said 'me, my mommy and my brother'.

Q. Did you ask her anything else?

A. I asked her where her daddy was.

Q. What did she say?

A. She said he was in jail.

Q. Did you ask her anything else?

A. I said 'who else has been here besides you and your mommy and your brother?'

Q. What did she say?

A. 'Rodney'.

Q. Did she indicate when he had been there?

A. I asked her that.

Q. What did she say?

A. She said 'last night'."

To be a spontaneous declaration the occurrence must be sufficiently startling to produce a spontaneous and unreflecting statement; there was an absence of time to fabricate; and the statement relates to the circumstances of the occurrence. *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.

As a preliminary observation I note there is a failure of any evidence showing the child was even aware that there had been any occurrence involving her mother or that she was acting under the influence of the

occurrence. The location of the child's bedroom was well apart from the rooms where the homicide took place. The first requirement of spontaneity would seem to require some knowledge of the incident which is supposed to be so startling and unusual that it substantially obviates the free will of the declarant and makes any response a part of the incident itself.

The lapse of time which occurred in this case is substantial and would have afforded an opportunity for reflection even if the child were aware of the incident occurring some 12 hours earlier. Added to these facts are the circumstances in which the statement was made by the child, *i.e.*, in response to questions seeking to elicit precisely the facts now relied on as being spontaneous. I fail to see how the statement of the child can be deemed to have been made under such stressful circumstances that its veracity is assured. I also note the child was not called as a witness even though she was apparently available, at least in the sense that her statement was not that of a person who died thereafter. The question naturally arises that if she was incompetent to testify as a witness, would this not adversely affect the propriety of admitting her hearsay statement. Even in the case relied upon by the trial court, *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310, the out-of-court statements were made no more than a few hours after the occurrence by a victim who was mortally wounded, dazed and in a state of shock. To admit the child's statement would wholly eliminate any requirement of spontaneity.

I believe the majority's reliance on *State v. Duncan* (1978), 53 Ohio St. 2d 215, 373 N.E.2d 1234, is misplaced because it in fact is supported by another and different exception to the hearsay rule. However, the quotation from *Duncan* in the majority opinion suggests what I believe to the the crux of this case and that is the declaration must be an "excited utterance," a circumstance which does not exist in this case. In *Duncan*, where the defendant was charged with a sexual assault, the victim who testified in her own behalf about the sexual assault was six years old, and the hearsay referred to related to the victim's making a prompt complaint after the offense had occurred. The "prompt complaint" exception to the hearsay rule in sexual assault cases is well established in this State and rests on a different basis then that relating to spontaneous declarations. Additionally, the circumstances surrounding the child's complaint to her mother are so dissimilar to the facts in the instant case that any analogy is inappropriate. I believe the trial court erred in admitting this evidence.

I also believe there were other errors which occurred during the trial of this case. Since the argument has been made that these errors to some extent were waived because of the defendant's failure to make appropriate objections or include them in his post-trial motion, no useful purpose would be served in discussing them in this opinion. It is sufficient

to say that they cumulatively add to the effect of other errors previously discussed and offer additional support for my conclusion that a new trial is required.

Because the errors occurring at trial denied the defendant a fair opportunity for the jury to accurately assess the conflicting testimony and determine issues of credibility, I believe a new trial is required.