THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL ROBINSON, Defendant-Appellant.

Third District   No. 3—90—0582

Opinion filed September 30, 1991.

Joseph N. Ehmann, of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Burmila, Jr., State's Attorney, of Joliet (John X. Breslin and Nancy Rink Carter, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

The defendant, Michael Robinson, was convicted of unlawful delivery of a controlled substance (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2)). The trial court sentenced him to six years' imprisonment. The defendant appeals. We affirm.

At trial, undercover narcotics officer Patricia Jordan testified that on December 20, 1988, Officer Terry Paggi told her to expect a phone call from a suspected drug dealer. According to Jordan, the defendant called on an undercover phone, asked for "Pat," and then asked what she needed. Jordan told the caller she needed a quarter ounce of cocaine. The caller told her it would not be a problem and stated he would call back the following day. The next day, the caller phoned Jordan and told her that a quarter ounce of cocaine would cost $400 and instructed her to meet him at Joliet Central High School at 5:30 p.m. That evening, Jordan met the defendant at the high school. The defendant then directed her to meet him at the F & W Tavern. Jordan went directly to the tavern and the defendant met her there 10 minutes later.

Approximately 6:30 p.m., the defendant made a phone call to a person he described as being his supplier. Shortly thereafter the defendant left the tavern, returned with the cocaine, and told Jordan he would give it to her outside. The defendant got into Jordan's car and gave her a plastic bag containing seven grams of cocaine. Jordan then gave the defendant $396. After the transaction, the defendant got out of the car and Jordan drove away. According to Jordan, there was no conversation regarding the defendant getting her a hotel room.

Police officer Terry Paggi participated in the surveillance of the December 21 transaction. Paggi testified he saw Officer Jordan meet the defendant in the Joliet Central High School parking lot at 6:14 p.m. Robert Russell then drove up and parked next to the defendant's car at 7:37 p.m. The defendant walked out of the tavern, got into Russell's car, and three minutes later returned to the tavern. Shortly thereafter, the defendant and Jordan left the tavern and got into Jordan's car. The defendant left a few minutes later.

Police officer Paul Kaupas participated in the surveillance of the transaction and in the defendant's arrest the next day. Kaupas con-

ducted a post-arrest interview of the defendant after advising him of his rights and obtaining a signed waiver. He testified the defendant told him he had known Robert Russell for 18 years. The defendant told Kaupas that Russell had asked him to deliver drugs in the past. Kaupas said the defendant admitted he was paid $45 for each delivery. The defendant also admitted to Kaupas he had been making drug deliveries for approximately one year. Kaupas testified an informant named "Doc" had set up the defendant's introduction to Jordan.

Robert Russell testified he had known the defendant for approximately 18 years and described him as being one of his best friends. Russell, who was incarcerated at the time of the defendant's trial, testified he was dealing drugs in December of 1988. According to Russell, the defendant contacted him by means of a pager on December 21, 1988. When Russell called the defendant, the defendant told him that "Doc" had called saying he had a lady in Chicago who wanted to pick up a quarter ounce of cocaine. Russell told the defendant to call back if he could get in touch with the woman. About an hour later, the defendant called back and said the woman was in Joliet. Russell agreed to bring the cocaine to the F & W Tavern. About 45 minutes later, Russell met the defendant in Russell's car outside the tavern. According to Russell, the defendant gave him $396 and Russell gave the defendant a package. Russell then drove off. Russell did not recall the defendant mentioning anything regarding getting a hotel for the woman.

The defendant testified he got a call from "Doc" on December 20, 1988. He had known "Doc" since June of 1988 and had met him through Russell. According to the defendant, "Doc" asked if the defendant would meet his girlfriend and make arrangements to get her a hotel room in Joliet. The defendant testified that "Doc" told him the woman's name was Pat, gave him her phone number, and asked him to call her.

The defendant made the phone call and explained to Pat that "Doc" had asked the defendant to meet her. Pat wanted the defendant to call back the next day to arrange the details of the meeting. According to the defendant, as he was about to hang up the phone, Pat asked him if he knew where she could get a quarter ounce of cocaine. The defendant said, "No," and Pat asked if he knew how much a quarter ounce would cost. The defendant initially said he did not, but then told her it would cost between $500 and $600. The defendant also told Pat he would try to find out how much it would cost, though he had no intention of actually doing so. Pat again asked about getting cocaine, and the defendant told her he would not have called if

he had known she wanted drugs. Pat then told the defendant to call her back the next day.

The defendant called Pat again at 2 or 3 p.m. the next day, and they agreed to meet at the Joliet High School at 5:30 p.m. The defendant told Pat he had unsuccessfully tried to find out how much a quarter ounce of cocaine would cost. He testified, however, he had made no such attempt.

When the defendant met Pat at the high school, she again asked if he had found out about the cocaine. After the defendant replied, "No," Pat asked if he could call the dealer now. The defendant told Pat to go to the F & W Tavern and wait while he went home to make the call. He then called Robert Russell and asked him to come down and take care of "Doc's" girlfriend. The defendant denied he called Russell to get drugs for Pat. However, he admitted he knew Russell was a drug dealer. He claimed to have made the call simply to get himself out of the situation. Upon finishing his conversation with Russell, the defendant went back to the F & W Tavern to wait with Pat.

After he arrived at the tavern, the defendant made a second phone call to Russell. Russell told the defendant that he would be leaving to go to the tavern in a few minutes. Sometime thereafter, the defendant heard Russell's car and went outside to meet him. Russell did not want to go inside the tavern, so he handed the defendant a package and told him to give it to Pat. The defendant testified he foolishly took the package and brought it inside the tavern. Once he was inside the tavern, Pat asked him, "Did you get it?" The defendant and Pat then walked out to Pat's car. Pat gave the defendant $396, and the defendant told her he would pay the missing $4 if Russell wanted it. He then asked if Pat wanted to go to the motel. She said, "No," and drove away.

Russell stopped by the defendant's house that evening to pick up the money. He then gave the defendant $45 so he could buy his daughter a Christmas present. The defendant denied the money was payment for his part in the delivery.

The defendant testified that when he was questioned after his arrest he just agreed to whatever his interrogators said. He denied he ever told Officer Kaupas that he was a drug dealer. On cross-examination, the defendant was pressed, over defense counsel's objection, to give an opinion regarding the veracity of Officer Kaupas' testimony. The defendant then said that Officer Kaupas was evidently lying.

The defendant was also asked about his employment. He testified that he had worked as a corrections officer for 7½ years and as a sheriff's deputy for 2½ years prior to his arrest.

During closing arguments, the prosecuting attorney indicated that because the defendant was a Will County sheriff's deputy, he had a duty to arrest Pat Jordan rather than sell her drugs. Additionally, despite several objections by the defense, which were sustained by the court, the prosecutor told the jury at various times in his closing argument that the jury had an opportunity to endorse the use of confidential informants in police investigations.

■ On appeal, the defendant first argues that he was denied a fair trial because the prosecutor asked him during cross-examination if Officer Kaupas had lied.

Asking a criminal defendant to give an opinion concerning the veracity of other witnesses is improper. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746; *People v. McGee* (1980), 88 Ill. App. 3d 447, 410 N.E.2d 641.) Although such tactics are improper, the error resulting therefrom may be harmless. *People v. Gross* (1979), 75 Ill. App. 3d 311, 393 N.E.2d 1308; *People v. Spates* (1978), 62 Ill. App. 3d 890, 379 N.E.2d 869.

We disapprove of the line of cross-examination used in the instant case. However, the evidence against the defendant was so overwhelming that the error resulting from the improper cross-examination was harmless.

■ The defendant's second argument on appeal is that the prosecution's closing argument denied him a fair trial. He contends the prosecutor misstated the law to the jury by indicating that because the defendant was a Will County sheriff's deputy he had a duty to arrest Pat Jordan rather than sell her drugs. Additionally, the defendant claims the prosecutor misstated the function of the jury by telling the jurors that they had an opportunity to endorse the type of investigation used in this case.

The Illinois Supreme Court has noted that an assistant State's Attorney is the representative of all of the people, including the defendant, and it is as much his duty to safeguard the rights of the defendant as those of any other citizen. (*People v. Lyles* (1985), 106 Ill. 2d 373, 478 N.E.2d 291.) At the same time, he is expected to prosecute with earnestness and vigor. (*People v. Lyles* (1985), 106 Ill. 2d 373, 478 N.E.2d 291.) Where statements made in closing argument serve no purpose except to inflame the jury, the statements constitute error. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.) However, improper remarks generally do not constitute reversible error unless

they result in substantial prejudice to the accused. *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.

In the instant case, the evidence of guilt was so overwhelming that the error resulting from the prosecutorial indiscretion was harmless. Although the prosecutor was overzealous and overstepped the bounds of prudent behavior, his actions do not constitute reversible error.

Accordingly, we affirm the judgment of the circuit court of Will County.

Affirmed.

BARRY and HAASE, JJ., concur.