THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE YOUNG, Defendant-Appellant.

First District (5th Division)   No. 1—99—0450

Opinion filed March 31, 2004.

910

Robert A. Fisher Law Offices, of Chicago (Robert A. Fisher, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, Jon J. Walters, and Daniel J. Kollias, Assistant State's Attorneys, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following a jury trial, Willie Young appeals his conviction of first degree murder resulting from the shooting of Jeffrey Sturghill. Young surrendered himself to police after a warrant had been issued for his arrest. Charged with violations of sections 9—1(a)(1) and (a)(2) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1), (a)(2) (West 1998)), Young was convicted and received a 50-year sentence. On June 29, 2001, this court entered an opinion reversing and remanding the matter for a new trial. On January 28, 2004, in an exercise of its supervisory authority, the Illinois Supreme Court ordered us to vacate our previous opinion and reconsider our judgment in light of *People v. Johnson*, 208 Ill. 2d 53 (2003). Having done as the supreme court instructed, we again reverse and remand for a new trial.

## BACKGROUND

On July 4, 1997, Young and his cousins Russell Warner and Jeannette Junious, who was visiting from Minnesota, left Warner's home and went to 31 East 120th Place in Chicago for a backyard barbeque at the home of Kenneth and Doanita Simmons (Kenneth and Doanita). Ms. Junious remained in the car while Young and Warner joined the party. From this point on there are conflicting accounts of what occurred.

Kenneth testified as a witness for the State. Though he had moved to Alabama on July 7, 1997, three days after the shooting, he was brought back to Illinois at the expense of the State's Attorney's office. At one time, he told the police he had no information regarding the shooting of Sturghill. After submitting to and flunking a lie detector test, he gave a different version of the events, indicating he did not want to implicate the defendant because he feared him and his gang affiliation. This was the subject of a defense motion *in limine*, the court ruling that the prior statements would not come in unless the

defendant opened the door during the trial. At trial, Kenneth testified on direct examination that Young and Warner arrived at the party just before dark. On cross-examination, however, Kenneth stated that they arrived at 10 or 11 p.m. According to Kenneth, Sturghill and Young began to argue over money owed to Young. He had previously heard them argue over the same $40 on another occasion. Kenneth heard Sturghill tell Young that he had just gotten out of jail and could not pay him until the next day. Young then allegedly pulled a gun on Sturghill, who then ran through the front door inside the house. The argument continued with Young outside and Sturghill inside the house. Young allegedly then told Sturghill to come on outside and talk and that he was not going to "smoke" him. Kenneth then stated that Sturghill told Young, "I'm not coming out, you got a gun and I don't." Kenneth then testified that, after Sturghill came out of the house, Young and Sturghill began to struggle over the gun. A shot was fired during the struggle and Warner indicated that he was shot in the hand. Kenneth then ran from the scene, looking back to see Young shooting at Sturghill as he fell over the porch railing. Kenneth stated that he did not see Sturghill with a gun at any time during the day. He further stated that Young told him after the shooting to either "get the steel" or "take the steel." He understood that to mean Young was trying to get him to take his gun. On cross-examination, he admitted that Young was not handing him anything when he said that to him.

Doanita also testified for the State. She had since moved to Missouri and had come to testify at the expense of the State's Attorney's office. She is the sister-in-law of Kenneth and on July 4, 1997, lived on the second floor at 31 East 120th Place. She was mainly an "ear" witness and mostly stated what she allegedly heard from her apartment. Between 11 and 11:30 p.m., she heard three people talking outside the house. As she was familiar with all three voices, she identified them as Young, Kenneth, and a Kenneth Williams. She heard Young say "Everybody around here owes me money and they pay and he gone [sic] pay me too." The two Kenneths then attempted to get Young to leave the individual who owed him money alone. She then stated that she later heard Sturghill say, "Nah man, I ain't opening up the door, I ain't got no gun in my hand and he got a gun in his hand." In contrast to Kenneth's testimony, she said these words were said in response to Kenneth saying "Come on out, you know, I don't need this in my mother's house." This was also allegedly said while Kenneth was banging on the door trying to get Sturghill to come out. Only then did she say that she heard Young say "Ah, man, come on out, I ain't gone [sic] smoke you." She then heard Sturghill say "All right, I ain't got

no problem with that." She then heard the door being unlocked. She then heard what she described as a struggle. She did not identify who was involved. She then heard Sturghill say, "Man, I told you I just got out of jail two days ago and I ain't got no money. I'll pay you in the morning, I'll give you some money in the morning." Kenneth had testified that these statements took place in the backyard and not on the porch or in the house.

She then heard a gunshot, and, while looking out of her window, she saw a person running from the house saying, "ah, man, you shot me." She said she saw a hole in the palm of this individual's hand. Then more shots were fired. She was not able to see who fired the shots. She then saw Young running from the house with a gun in his hand. The parties stipulated, however, that if called to testify, Detective Jack Hines of the Chicago police department would testify that he was assigned to this case, he interviewed Doanita and she said that she never saw Young with a gun on the day in question.

In addition to Kenneth and Doanita, the State's case consisted of Joyce Sturghill, Jeffrey Sturghill's mother. She testified, as a life and death witness, to having seen her son when he was alive and again when he was dead.

The State also called John Paulson, an employee of the forensic division of the Chicago police department. He works for the department as an evidence technician forensic investigator. He explained his job as photographing and collecting physical evidence found at a crime scene and transferring that evidence to the Illinois State Police crime lab. Once Paulson received the call about Sturghill's death, he got to the scene approximately 30 minutes later. He indicated the crime scene had been roped off by the patrol officers and was being protected from tampering. After speaking with the police personnel on the scene, Paulson immediately began the processing of the crime scene by taking photographs of the entire location with the body and adjoining areas. Paulson indicated he found the victim lying on his back, faceup. There were cartridge cases on the adjoining porch and one cartridge case near the victim's body. The total number of cartridge cases was seven, with one of that seven being the case near the body. After putting on plastic gloves and breaking out the evidence envelopes, Paulson collected and packed up the evidence. Before fingerprinting Sturghill, Paulson indicated he administered the gunshot residue test to his hands. He then gave inventory numbers to the cartridge cases he found. The cases on the porch were given the inventory number 1839767, while the cartridge found near the body got inventory number 1839766. The gunshot residue test kit was inventoried as 1839768. Paulson then described the bags and envelopes used by the

forensic division in their duties. On cross-examination, Paulson reiterated what he found when he processed the crime scene. He was also asked to describe, step-by-step, the process of doing a gunshot residue test on a dead person's hands to determine the presence of lead, antimony and barium.

Following the testimony of Paulson, the trial court was told that Dr. Barry Lifschultz, a staff forensic pathologist with the Cook County medical examiner's office, had once again modified his opinion regarding the nature of the entrance and exit wounds on Sturghill's body. This announcement was made to the trial court a mere 15 minutes before Lifschultz was set to testify. The assistant State's Attorney in this case had just, one day before trial began, advised the defense counsel that Dr. Lifschultz had advised the prosecutor that he would give opinions on entrance and exit wounds. The trial court was asked to bar testimony regarding the entrance and exit wounds. In explanation of the change of opinion, the trial court learned that Lifschultz had further reviewed the photographs and was prepared to give a more thorough explanation of the entrance and exit wounds and was now able to render an opinion about the wound on Sturghill's leg. The trial court indicated it would not prevent Lifschultz from testifying thoroughly about the entrance and exit wounds. Although the trial court indicated it did not feel the leg testimony would prejudice the defendant's case, it offered the defense a chance to have Lifschultz testify out of sequence. In spite of the trial court's offer, and in spite of defense objections to the late disclosure of the new opinions by the State, the defense indicated it was ready to proceed. The defense counsel admitted he was lacking in the expertise necessary to appropriately cross-examine Dr. Lifschultz on his new and improved medical opinions. In spite of this, defense counsel did not seek a continuance because he did not wish to break his four-term trial demand.

Following the colloquy with the trial court about the change in testimony, Lifschultz was tendered to the trial court as an expert witness in forensic pathology. He testified to the autopsy process in general and the autopsy of Jeffrey Sturghill in particular. He found three through-and-through gunshot wounds, a small abrasion over the left eye and a small abrasion on the back of the right ankle. Lifschultz found that the abrasions were consistent with a fall over the railing. He testified that he can tell the difference between entrance and exit wounds because of the tearing of the skin associated with exit wounds and the presence of specific abrasions of the tissue surrounding the entrance wounds. Lifschultz concluded that the wound at the side of the back was an entrance wound. The wound at the left side of the

back was also an entrance wound. The corresponding wound on the right side of the belly was an exit wound. There were also gunshot wounds to the left hip and lower right leg, the photographs of which were marked by the witnesses as to entrance and exit.

On cross-examination, Lifschultz was questioned as to how he could be so certain at trial as to which were entrance and exit wounds even though there were no such designations made at the time of the autopsy. At no point in the autopsy report did Lifschultz document which were entrance and which were exit wounds. He was then questioned as to the change in his opinions from the time they were originally made until 15 minutes prior to the testimony for which he was being cross-examined. Lifschultz claimed his new opinion was a refinement of his original opinion.

Next to testify was Scott Rochowicz, an employee of the Illinois State Police Forensic Science Center in Chicago, Illinois. He testified to the gunshot residue test. He found elevated levels of barium, antimony and lead on the decedent's hands. He found the levels to be inconclusive of gunshots because those levels were not as high as he would have expected, though he admitted he found levels that were elevated above the amounts normally found on the general population. He did not test the decedent's clothing for gunshot residue, even though he admitted there could have been residue there.

Finally, the State called Michael McDermott, a detective with the Chicago police department. He testified to the process he went through while searching for Young. This process was cut short when Young turned himself in.

The defendant's version of the events is different. Warner testified that he was an assistant family teacher at Maryville Academy. Young is his first cousin and he has known him all of his life. On July 4, 1997, he was at his mother's house at 69th and Justine together with his mother, her boyfriend, his sister, his half sister Jeannette Junious, nephews, and his cousins, including Young. At 10 p.m., he, Young and his half sister decided to go visit some friends on 120th Street. Kenneth was Young's friend. He drove. He and Young got out of the car and went to the backyard of the house. Young was talking to Kenneth when some third person started making some comments and then drew a gun. Kenneth and Young told him to put the gun up and he did. Then he saw the three of them go into the house. He followed them into the house. Young and Kenneth were having a conversation and the third person (Sturghill) was getting into their conversation. At that point, Sturghill drew his gun again. Warner, Young and Kenneth spoke to him and told him to calm down and put the gun up. Sturghill appeared to Warner to be kind of frustrated, but he listened

and went out on the front porch. Warner then followed him out on the front porch. On the porch, Warner said, he was trying to calm Sturghill down and get him to put the gun up. Young and Kenneth were still inside the house. Sturghill motioned like he was going to go back inside the house. Warner stepped in front of him and told him to put the gun up. After about two minutes, Sturghill appeared to have calmed down and put the gun back in his waist. Warner started to go into the house and saw out of his peripheral vision that Sturghill was raising the gun. Warner thought that he was about to be shot. He went for the west side of the porch and jumped off the porch. He felt a twinge of pain in his left hip. He reached back to feel it and then saw blood on his hand. He then realized he had been shot. He then screamed "I been shot." He pulled himself up on the fence and then got into his car. Warner's clothing that he wore that day and his wound in the left hip near the buttocks were displayed to the jury. On cross-examination, he admitted that he did not go to a hospital. He did not see Sturghill get killed. On July 26, 1997, the police picked him up for questioning. A nine-page statement was taken and he was instructed to sign each page by an assistant State's Attorney. He then testified that he tried to tell the police about the decedent having a gun and about being shot by the decedent, but they did not want to hear that and he did not put that in the statement when he talked to the assistant State's Attorney. He felt intimidated by the police officer who was present at all times. He testified that the police said he could be charged as an accessory to murder and they did not want to hear anything that sounded favorable to his cousin. He was held in custody for almost two days before he spoke to the assistant State's Attorney. The statement was partially disclosed on cross-examination to the effect that Warner said he had gone to a liquor store and returned to hear three voices arguing along the front sidewalk on the south side of 120th Place (two of which belonged to Young and Kenneth) and that he heard gunshots coming from the front porch. After he heard the shots fired, he got down on his hands and crawled back to his car, where his sister was, and he never looked back to see who was shooting. The statement also said he did not recall looking at his hands or seeing any blood on them and that, as soon as he got in the car, Young got in on the passenger side. He stated that he made some of this up in order to placate the police. He was asked if he knew Ms. Simmons and the following exchange took place:

"A. No, I do not. I know of her. I do not know her.

Q. Can you think of any reason in the world why she would testify that you are a bald[-]face[d] liar?

Defense Counsel: Objection.

THE COURT: Sustained. Don't answer that."

The defendant took the stand in his own behalf. He testified that he was 31 years old and had a year in college at North Community College. On July 4, 1997, he was at his cousin's house. Several people were there. He, Warner, and Junious went to visit one of his friends, Kenneth Simmons. Warner drove, Junious was in the front passenger seat, and he was in the backseat. He and Warner got out of the car at Kenneth's house and left Junious in the car. After Warner knocked on the front door, Young suggested that they go around back, which they did. In the backyard were Rico, Deuce, Sturghill, Kenneth, Tiny, and Kenneth's sister Valerie. They were back there barbequing. He spoke to a few of the people and then asked Kenneth about some money that Kenneth owed him. Kenneth said he did not have it. Young then said "you never pay me on time whenever I give you money." Then Jeffrey Sturghill asked Young if he was selling cocaine over there. Young said it was none of his business. Sturghill became angry and began to shout at Young. Young shouted back. The confrontation did not get physical, however. Rico, Deuce and Kenneth stepped in between them, saying that it was no cause for that. Kenneth then said "we're not going to have that here." Then Sturghill pulled out a gun. Rico and Deuce told him to put it up. Sturghill uttered a profanity and put his gun away. Young then said that he did not need this "s--t" and he then told Sturghill that only a "b---h" would shoot him in the back and then turned and walked away. Kenneth then invited him into the house to talk to him. Young and Kenneth went into the house. Sturghill also came into the house with Warner. Kenneth asked Young to stay because nothing would happen to him over there. Young indicated that he should leave. Sturghill then said to Young that when he stepped outside, Sturghill would "whip his ass." Kenneth told Sturghill to "chill out, that it is not going to happen" in his mother's house. Sturghill went outside on the front porch. Warner followed him outside. Shortly thereafter they heard a gunshot. Young and Kenneth went to the door and paused for a while. Young looked out and heard Warner say he had been shot. Young saw Warner walking along the sidewalk along the gate. Young then stepped out of the door. Sturghill turned to him with his gun up. Young then shot Sturghill.

The jury deliberated for less than two hours before returning a guilty verdict. Young was sentenced to 50 years, from which this appeal follows.

## ANALYSIS

### Standard of Review

■ The standard of appellate review of a criminal case involves our

"view[ing] the evidence in the light most favorable to the prosecution and determin[ing] whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt." *People v. Elliott*, 337 Ill. App. 3d 275, 280 (2003), citing *People v. Collins*, 106 Ill. 2d 237 (1985). "In evaluating an attack on the sufficiency of the evidence, we do not retry the case." *People v. Jones*, 337 Ill. App. 3d 546, 555 (2003), citing *Collins*, 106 Ill. 2d at 261. "Instead, we defer to the jury's determinations of the credibility of the witnesses, the weight of their testimony, and the reasonable inferences from the evidence." *Jones*, 337 Ill. App. 3d at 555, citing *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). "A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt regarding the defendant's guilt." *Elliott*, 337 Ill. App. 3d at 280, citing *People v. Flowers*, 306 Ill. App. 3d 259 (1999).

## Sufficiency of the Evidence

Young claims the evidence presented was insufficient to convict him of first degree murder. He argues that, once a defendant claims a shooting was done in self-defense, the State must not only prove the elements of the offense beyond a reasonable doubt, but also that the shooting was not done in self-defense. Young argues that the physical and scientific evidence corroborated his theory that the shooting was the result of self-defense. He points to the spent cartridge case found near Sturghill's body. That cartridge case was found not to be from the firearm used to shoot Sturghill. Young claims that the State offered little more than speculation for how that cartridge case got next to the body. According to Young, the scientific tests performed on Sturghill showed elevated levels of lead, antimony and barium, all elements associated with the firing of guns. While the tests were deemed inconclusive, Young attaches significance to the fact that the levels of those elements were higher than the levels that would likely be found on the hands of an ordinary citizen who had not fired a gun.

Young also argues that the gunshot wounds were consistent with the claim of self-defense. Dr. Lifschultz found that one of the bullets entered at the left side of Sturghill's back and exited at the right side of the belly, traveling at a downward angle. Young claims this is consistent with his testimony that he shot Sturghill as Sturghill started to turn back toward him. In light of all of the physical and scientific evidence, Young claims he was justified in shooting Sturghill.

The State responds that it proved Young guilty of first degree murder beyond a reasonable doubt. The State argues that, with the evidence viewed in the light most favorable to the prosecution, Young failed to demonstrate that he acted in self-defense. The State argues

that Young was clearly the aggressor and that Sturghill never threatened him. Even if Young believed he was in danger, that belief was not reasonable because Young shot Sturghill in the back. The State also responds that the credible and thoroughly corroborated testimony of Kenneth and Doanita established Young's guilt. Additionally, the State argues that Young's fleeing and concealing evidence provided further support for its theory of guilt. As to the exculpatory statement of Russell Warner, the State argues it was unbelievable and impeached. As a result, the State argues, the evidence, viewed *in toto*, is overwhelming.

■ Whether a killing is justified under the law of self-defense is a question of fact to be determined by the trier of fact. *People v. Felella*, 131 Ill. 2d 525, 533 (1989). "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 343 Ill. App. 3d 431, 436 (2003), citing *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995); *People v. Grayson*, 321 Ill. App. 3d 397, 401-02 (2001). "The elements of self-defense are (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Lee*, 343 Ill. App. 3d at 436, citing *Jeffries*, 164 Ill. 2d at 127-28. "If the State negates any one of these elements, the defendant's claim of self-defense must fail." *Lee*, 343 Ill. App. 3d at 436, citing *Grayson*, 321 Ill. App. 3d at 402. Because the jury determines witness credibility, draws reasonable inferences from testimony, and resolves conflicts in the evidence, it need not accept a defendant's claim of self-defense. *People v. Boyd*, 307 Ill. App. 3d 991, 995 (1999). "A jury may consider the probability or improbability of the defendant's account, the circumstances surrounding the crime, and the relevant testimony of other witnesses." *Lee*, 343 Ill. App. 3d at 436, citing *People v. Dillard*, 319 Ill. App. 3d 102, 106 (2001). "A jury therefore need not accept a defendant's claim of self-defense." *Lee*, 343 Ill. App. 3d at 436, citing *People v. Boyd*, 307 Ill. App. 3d 991, 995 (1999). The standard of review for this issue is whether, taking all of the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the defendant did not act in self-defense. *People v. Lee*, 311 Ill. App. 3d 363, 367 (2000).

■ In this case, substantial evidence was presented to show that

the defendant did not act in self-defense in killing the victim. This includes the testimony of Kenneth, who stated that defendant instigated the argument with the victim regarding the $40 and that defendant first pulled his gun and demanded the money in an "unfriendly" manner. Doanita heard this argument through the open windows of her house and was able to corroborate Kenneth's testimony. Both Kenneth and Doanita heard the defendant state that "everybody around here owes me money and they pay[,] and he's gone [sic] to pay me too." After the argument escalated, Kenneth stated that he tried to convince the defendant to leave the victim alone and that the victim ran into the house through the back door. Kenneth asked the victim to come outside, and both Kenneth and Doanita heard the victim state that he did not want to leave the house because he was unarmed and the defendant was not. Kenneth's testimony that he never saw the victim with a gun corroborated this statement. Both Kenneth and Doanita also heard the defendant ask the victim to come outside and promise not to shoot him. Upon exiting the house, the victim and the defendant became involved in a physical struggle. Kenneth stated that, at that point, a shot was fired and he saw defendant, with his arm extended, shoot the victim "five or six times." It was within the jury's province to believe Kenneth's and Doanita's version of the incident rather than the defendant's version, and it was within the jury's province to believe that, given the number and location of gunshot wounds the defendant inflicted, the defendant was not acting in self-defense.

### Prosecutorial Misconduct

Young next argues that prosecutorial misconduct deprived him of due process and a fair trial. Since none of the State's witnesses were able to observe all of the events and there was so much scientific evidence, Young argues, this is a closely balanced case. Young argues that, in such closely balanced cases, the prosecutorial misconduct should be treated as plain error. Young claims the prosecutor improperly questioned him on the credibility of other witnesses, then made the subject of the improper cross-examination the centerpiece of his closing argument to the jury, in that he repeatedly tried to bolster the credibility of the State's witnesses all the while undermining his own credibility. The prosecutor even characterized the questions as "trick questions."

Young next claims the prosecution improperly shifted the burden of proof to the defendant. This was done, according to Young, by consistently misstating the jury's function and the State's burden of proof. Instead of telling the jurors that the State had to prove its case

against Young beyond a reasonable doubt, the prosecutor told the jury, "[W]hat you do need to decide this case is do you believe Doanita and Kenneth Simmons or do you believe Russell Warner and Willie Young." Young claims it was wrong for the prosecutor to suggest that the jury's determination of whom it believed would lead it to both the truth of the case and a verdict of guilty. Since no one in this case disputes that Young shot Sturghill, thus causing the fatal injuries, the issue for the jury to decide was whether Young had the requisite mental state for first degree murder. The question is whether the shooting was in self-defense and therefore justified. As the issue was presented to the jury, according to Young, the burden was improperly shifted to him. This had the effect of compromising the fairness of the judicial process by requiring Young to prove his innocence instead of making the State prove his guilt.

Young also claims he was prejudiced when the State cross-examined him on his postarrest silence. The prosecutor, after hearing some of Young's testimony, asked him whether the trial testimony was the first time he had said anything regarding the details of his self-defense claim. He then later commented on the postarrest silence in the closing argument. According to Young, this improperly implicated his right to remain silent because it was intended to invite the jury to infer that the defense was a recent fabrication.

Young further claims the prosecutor improperly questioned him as to other crimes and bad acts. Young made a motion for discovery which specifically requested disclosure of prior acts or convictions of a similar nature for proof of knowledge, intent, motive or *modus operandi*. The State's answer to the discovery motion listed no prior bad acts or convictions. Young subsequently made a motion *in limine* relative to bad acts, which was granted by the trial court. In spite of the motion *in limine*, the prosecutor began to violate the order by referring to the shooting having been over a drug debt, even though no such evidence was presented in the case. When cross-examining Young, the prosecutor kept referring to prior bad acts. Young maintains this was only done to prejudice him in the eyes of the jury. Finally, Young argues that the prosecutor improperly vouched for witnesses and injected his personal opinions as to the evidence.

The State initially responds that Young has waived most of these contentions by failing to object at trial and raise these issues in a post-trial motion. If this court finds these contentions not to be waived, the State responds that the challenged remarks were proper or that any error occasioned by them is harmless beyond a reasonable doubt. The State again stands on its position that the evidence of guilt was not closely balanced, thereby necessitating a plain error analysis; it was

overwhelming. The State maintains that the only issue at trial was whether Young acted in self-defense. The State argues it presented credible evidence disproving several elements of that defense.

■ "As a general rule, a defendant must object to an error at trial and include the objection in a posttrial motion to preserve it for review on appeal." *People v. Canulli*, 341 Ill. App. 3d 361, 368-69 (2003), citing *People v. Basler*, 193 Ill. 2d 545, 549 (2000); *People v. Mullen*, 141 Ill. 2d 394, 401 (1990); *People v. Casillas*, 195 Ill. 2d 461, 491 (2000); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result. *People v. Armstead*, 322 Ill. App. 3d 1, 11-12 (2001), citing *People v. Lopez*, 152 Ill. App. 3d 667, 676 (1987). Where errors claimed on appeal are not individually considered sufficiently egregious to entitle the defendant to a new trial but they nevertheless create a pervasive pattern of unfair prejudice to defendant's case, a new trial may be granted on the ground of cumulative error. *People v. Mendez*, 318 Ill. App. 3d 1145, 1154 (2001), citing *People v. Blue*, 189 Ill. 2d 99 (2000). A substantial right has been denied if the error affected the proceedings to such a degree that we cannot confidently state that the defendant's trial was fundamentally fair. *People v. Keene*, 169 Ill. 2d 1 (1995). This court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue*, 189 Ill. 2d 99 (2000).

■ "Illinois reviewing courts, faced with allegations of plain error, examine, substantively, on a rudimentary level, the records before them to determine if the claimed errors constitute 'plain' and 'reversible' errors." *People v. Johnson*, 208 Ill. 2d 53, 63 (2003), citing *People v. Keene*, 169 Ill. 2d 1, 17 (1995); *People v. Terrell*, 185 Ill. 2d 467, 526 (1998) (Freeman, C.J., specially concurring, joined by McMorrow, J.). "Our plain error rule is set forth in Supreme Court Rule 615(a), which states as follows: 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' " *Johnson*, 208 Ill. 2d at 63-64, quoting 134 Ill. 2d R. 615(a). "[The Illinois Supreme Court's] prior decisions make clear that this court may invoke the plain error rule to review alleged errors not properly preserved when (1) the evidence in a criminal case is closely balanced *or* (2) *the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process.*" (Emphasis added.) *Johnson*, 208 Ill. 2d at 64, citing *People v. Lindsey*, 201 Ill. 2d 45, 54 (2002), quoting *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000); *People v. Hall*, 194 Ill.

2d 305, 335 (2000); *People v. Williams*, 193 Ill. 2d 306, 348-49 (2000). It is important to acknowledge that the supreme court in *Johnson* used the conjunction "or" in explaining when reviewing courts may invoke the plain error rule. In so doing, the supreme court recognized that certain errors are of such a magnitude that they are plain without regard to the relative closeness of the evidence.

■ Every defendant is entitled to fair trial free from prejudicial comments by the prosecution. *People v. Billups*, 318 Ill. App. 3d 948, 958 (2001). It is well settled that the prosecutor has wide latitude in making closing remarks. *People v. Bell*, 343 Ill. App. 3d 110, 116 (2003), citing *People v. Foster*, 322 Ill. App. 3d 780, 790 (2000); *People v. Mendez*, 318 Ill. App. 3d 1145, 1152 (2001). "A prosecutor may comment on the evidence and may draw all legitimate inferences from the evidence, even if unfavorable to the defendant." *Bell*, 343 Ill. App. 3d at 115, citing *People v. Toney*, 337 Ill. App. 3d 122, 147 (2003). Improper remarks will not merit reversal unless they result in substantial prejudice to defendant which constitutes a material factor in the conviction. *Bell*, 343 Ill. App. 3d at 116, citing *Foster*, 322 Ill. App. 3d at 790; *People v. Castaneda*, 299 Ill. App. 3d 779, 784 (1998) (reversible error results when comments by a prosecutor substantially prejudice a defendant, causing one to question whether the guilty verdict resulted from those comments); *People v. Joyner*, 317 Ill. App. 3d 93, 105 (2000) ("where a prosecutor's remarks exceed the bounds of proper comment, a reviewing court should not disturb the verdict unless it can be said that the remarks in question resulted in substantial prejudice to the accused such that absent those remarks the verdict would have been different"). In *Johnson*, the supreme court indicated the following:

"[W]e note that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine. See *United States v. Young*, 470 U.S. 1, 33 n.16, 84 L. Ed. 2d 1, 24 n.16, 105 S. Ct. 1038, 1055 n.16 (1985) (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.); *People v. Moss*, 205 Ill. 2d 139, 189 (2001) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). Indeed, concern over the cumulative effect of errors that 'created a pervasive pattern of unfair prejudice,' much of it attributable to misconduct of the prosecutors, is what drove this court's analysis in [*People v. Blue*, 189 Ill. 2d 99, 138-40 (2000)]. This court recognized in *Blue* the 'synergistic effect' that multiple errors of this kind can have in a trial. *Blue*, 189 Ill. 2d at 139. See also *People v. Hill*, 17 Cal. 4th 800, 847, 952 P.2d 673, 699, 72 Cal. Rptr. 2d 656, 682 (1998) (a unanimous California Supreme Court, foregoing harmless error

analysis, reversed a death penalty conviction due to pervasive prosecutorial misconduct and trial errors that, cumulatively, 'created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors')." *Johnson*, 208 Ill. 2d at 64-65.

■ The allegedly improper comments must be evaluated "in light of the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *Billups*, 318 Ill. App. 3d at 958-59, citing *People v. Barker*, 298 Ill. App. 3d 751, 757 (1998); *Mendez*, 318 Ill. App. 3d at 1152, citing *People v. Morgan*, 142 Ill. 2d 410 (1991). "The trial court can generally correct any error resulting from an improper remark by sustaining an objection or instructing the jury to disregard the statement." *Bell*, 343 Ill. App. 3d at 115, citing *Foster*, 322 Ill. App. 3d at 791.

In addition to comments, a prosecutor can overstep his or her bounds by conduct. As alleged by Young, this can include the improper questioning of witnesses. Young claims that, by asking him to comment on the testimony of the medical examiner, and why other witnesses might lie in their testimony, the prosecutor improperly removed from the province of the jury the duty to determine the credibility of witnesses.

In this case, the prosecutor asked defendant several times to comment on the State witnesses' veracity: "So the medical examiner lied when he said that this was an entrance wound?"; "So you can't think of any reason why he [Kenneth Simmons] would lie about what you did, can you?"; "We expect our enemies to lie on us. It [*sic*] was your friend, wasn't he?"; and "Can you think of any reason why she [Doanita Simmons] would lie?" Defendant answered that he did not know what the medical examiner said, that Kenneth and Doanita were his friends and that he did not know of any reason why they would lie.

■ Young also complained that the prosecutor confused the jury by misstating the jury's responsibilities and the State's burden of proof. " 'It is well established that a prosecutor's misstatements of law in closing argument can be grounds for reversal. See *United States v. Bohle*, 445 F.2d 54 (7th Cir. 1971); *United States v. Phillips*, 527 F.2d 1021 (7th Cir. 1975). Included within this restriction are statements that in effect distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict.' " *People v. Crossno*, 93 Ill. App. 3d 808, 821 (1981), quoting *United States v. Vargas*, 583 F.2d 380, 386 (7th Cir. 1978). This is similar to what happened to Young. The prosecutor told the jurors that, to determine guilt or innocence, they needed to decide which witnesses they

believed. "The test is, of course, not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." *Crossno*, 93 Ill. App. 3d at 822. While we acknowledge that the presumption of innocence is the golden thread running throughout our jurisprudence, and that it is not threatened by every error but only those of significant magnitude resulting in the denial of a fair trial, there are those errors we simply cannot excuse or ignore. Here, this includes the prosecutor's practice of cross-examining Young regarding his postarrest silence, commenting on prior bad acts and other crimes, as well as improperly vouching for certain witnesses and interjecting his own opinions regarding the evidence, again infringing on the province of the jury.

The prosecution's practice of asking a criminal defendant to comment on the veracity of other witnesses who have testified against him has consistently and repeatedly been condemned by this court because such questions intrude on the jury's function of determining the credibility of witnesses and serve to demean and ridicule the defendant. *People v. Martin*, 271 Ill. App. 3d 346, 356 (1995); *People v. Morris*, 229 Ill. App. 3d 144, 168 (1992); *People v. Robinson*, 219 Ill. App. 3d 235, 239 (1991); *People v. Nwadiei*, 207 Ill. App. 3d 869, 876-77 (1990); *People v. Matthews*, 205 Ill. App. 3d 371, 414-15 (1990); *People v. Mitchell*, 200 Ill. App. 3d 969, 977 (1990); *People v. Foster*, 190 Ill. App. 3d 1018, 1029 (1989); *People v. Barnes*, 182 Ill. App. 3d 75, 85-86 (1989); *People v. Hopkins*, 107 Ill. App. 3d 422, 426 (1982); *People v. Dowd*, 101 Ill. App. 3d 830, 844 (1981); *People v. Best*, 97 Ill. App. 3d 1083, 1086-87 (1981); *People v. McGee*, 88 Ill. App. 3d 447, 453 (1980); *People v. Cohen*, 83 Ill. App. 3d 706, 708 (1980); *People v. Bost*, 80 Ill. App. 3d 933, 946-47 (1980); *People v. Moore*, 80 Ill. App. 3d 996, 1005 (1980); *People v. Hainline*, 77 Ill. App. 3d 30, 33 (1979); *People v. Robinson*, 67 Ill. App. 3d 539, 550-551 (1978); *People v. Riley*, 63 Ill. App. 3d 176, 184-85 (1978); *People v. Spates*, 62 Ill. App. 3d 890, 893-94 (1978); *People v. Meeks*, 11 Ill. App. 3d 973, 979-80 (1973); *People v. Hicks*, 133 Ill. App. 2d 424, 434 (1971). This practice has generally been deemed harmless error where evidence of defendant's guilt was overwhelming. Where the evidence in a case is closely balanced and the credibility of the witnesses is a crucial factor underlying the jury's determination of defendant's guilt or innocence, the error may not be harmless. Additionally, in light of our interpretation of the supreme court's opinion in *Johnson*, even one error that endangers the integrity of the judicial process is sufficient to justify reversal of a conviction improperly obtained.

■ By inappropriately suggesting that the jury could resolve the is-

sue of guilt or innocence by determining which witnesses it believed, cross-examining Young on his postarrest silence and injecting its own opinions regarding the evidence and the believability of witnesses, the prosecution undermined this defendant's right to a fair trial. It served to endanger the integrity of the judicial process to such a degree that we simply cannot ignore the errors.

## Ineffective Assistance of Counsel

██ Young next claims he was denied his right to a fair trial due to ineffective assistance of counsel. "The sixth and fourteenth amendment of the United States Constitution guarantee the fundamental right of a defendant in a criminal case to be effectively assisted by counsel." *People v. Spann*, 332 Ill. App. 3d 425, 429 (2002), citing U.S. Const., amends. VI, XIV. "Effective assistance of counsel refers to competent, not perfect, representation." *Spann*, 332 Ill. App. 3d at 430, citing *People v. Odle*, 151 Ill. 2d 168, 173 (1992). The Illinois Supreme Court has repeatedly held that "[t]o demonstrate ineffective assistance of counsel, defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that the attorney's deficient performance resulted in prejudice to the defendant." *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001), citing *People v. Williams*, 181 Ill. 2d 297, 320 (1998); *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). "In order to establish an ineffective-assistance-of-counsel claim, a defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Brooks*, 334 Ill. App. 3d 722, 725-26 (2002), citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000), citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Evans*, 186 Ill. 2d 83, 93 (1999); *Brooks*, 334 Ill. App. 3d at 725-26. There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Enis*, 194 Ill. 2d at 376-77, citing *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Enis*, 194 Ill. 2d at 377, citing *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Wilson*, 191 Ill. 2d at 370. "In *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984), the Illinois Supreme Court

adopted the *Strickland* rule that the 'benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result' and that '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Spann*, 332 Ill. App. 3d at 429, quoting *Strickland*, 466 U.S. at 686, 694, 80 L. Ed. 2d at 692-693, 698, 104 S. Ct. at 2064, 2068.

■ When the claimed error is based on trial strategy, trial counsel's decisions are generally immune from claims of ineffective assistance of counsel. *People v. Reid*, 179 Ill. 2d 297, 310 (1997), citing *People v. Madej*, 177 Ill. 2d 116, 148 (1997). The Illinois Supreme Court has carved out an exception to this general rule when the strategy chosen is "so unsound that counsel entirely fails to conduct any meaningful adversarial testing." *Reid*, 179 Ill. 2d at 310, citing *Madej*, 177 Ill. 2d at 149. "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *People v. Arroyo*, 339 Ill. App. 3d 137, 155 (2003), citing *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

■ As a threshold matter, we find ineffective assistance in several places, first from the failures of defense counsel to step up and object to the conduct of the prosecutor and also to the admission defense counsel made in open court that he lacked the requisite expertise to appropriately cross-examine experts on their opinions. Though the trial court indicated that a continuance would be acceptable to give time to better prepare, Young's trial counsel indicated readiness. Admittedly, trial counsel was placed on the horns of a dilemma when facing the defendant's competing interests of having a speedy trial with having effective representation at trial. Additionally, trial counsel's representation fell below the minimal *Strickland* level of effectiveness during cross-examination because he not only bolstered the testimony of the experts, but repeatedly referred to his inability to properly defend against those expert opinions. Trial counsel's only job was to explain ways the opinions of the expert were consistent with the theory of self-defense. If counsel is mounting a self-defense argument, then effective representation would require either refuting opposition testimony or simply developing it in a way that is consistent with the defense theories being espoused. Additionally, though this is not necessarily a trial error, effective assistance in mounting a self-defense claim would dictate that counsel order gunshot residue tests of Sturghill's clothing if the clothing was still available, especially when the State seemed unable or unwilling to do so as part of its normal investigative process.

We acknowledge that many of the errors of which defendant complains have been found by Illinois courts not to constitute reversible error when found to have a limited an impact on the proceedings. See, *e.g.*, *People v. Turner*, 128 Ill. 2d 540, 557-58 (1989) (queries regarding why another witness testified as he did held to be proper); *People v. Riley*, 63 Ill. App. 3d 176, 184-85 (1978) (questioning of another witness's veracity held improper, but generally not reversible error); *People v. McKinley*, 242 Ill. App. 3d 124, 131-32 (1992) (prosecutor's comment on defendant's failure to produce an expert held to be proper where prosecutor does not assert that defendant had an obligation to prove the expert wrong); *People v. Pecoraro*, 144 Ill. 2d 1, 16 (1991) (comment that the jury's disbelief in certain witnesses will lead to a not-guilty verdict held to be proper where the prosecution's version of the incident varies substantially from the version given by the defense); *People v. Bailey*, 249 Ill. App. 3d 79, 82 (1993) (holding that it is not error *per se* for a prosecutor to use the first person in addressing the jury); *People v. Hall*, 194 Ill. 2d 305, 339 (2000) (holding that although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different); *People v. Buss*, 187 Ill. 2d 144, 245-46 (1999) (holding that counsel was not ineffective where defendant has not demonstrated prejudice resulting from his counsel's failure to object to the portion of the argument at issue); *People v. Steading*, 308 Ill. App. 3d 934, 939 (1999) (holding that counsel is not ineffective where defendant has not demonstrated how any further investigation of the witness would have changed the outcome of the case); *People v. Harris*, 182 Ill. 2d 114, 158 (1998) (holding that defense counsel's admission of his own ineffectiveness is not determinative of the issue).

In light of the foregoing and our conclusion that the infirmities in the case at bar so seriously undermined the integrity of the judicial proceedings, we need not address whether each instance of the claimed ineffective assistance of counsel would justify reversal on its own. The process was tainted by the prosecution such that the arguable failures of the defense acting in concert therewith denied this defendant a fair trial.

CONCLUSION

In light of the foregoing, the decision of the trial court is reversed and the cause remanded for a new trial.

Reversed and remanded.

JUSTICE THEIS, specially concurring:

I agree with the majority's result, but not its reasoning. I specially concur to clarify the issue regarding the prosecutor's practice of asking defendant to comment on the veracity of witnesses. The evidence in this case is closely balanced and, thus, warrants review under the plain error doctrine. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). Here, defendant asserted self-defense and offered witnesses to corroborate his account of the events, making credibility a significant issue. Forensic tests revealed elevated levels of lead, barium, and antimony on the victim's hands, giving rise to an inference that the victim fired a gun, although the tests were deemed inconclusive. Further, the police determined that a shell casing found near the victim's body did not come from defendant's weapon. The medical examiner's report concerning entrance and exit wounds on the victim could also lend support to defendant's self-defense claim. Thus, the evidence is closely balanced and is properly reviewed under the plain error doctrine.

In this case, the prosecutor asked defendant several times to comment on the State's witnesses' veracity: "So the medical examiner lied when he said that this was an entrance wound?", "So you can't think of any reason why he [Kenneth Simmons] would lie about what you did, can you?", "We expect our enemies to lie on us. It [*sic*] was your friend, wasn't he?", and "Can you think of any reason why she [Doanita Simmons] would lie?" Defendant answered that he did not know what the medical examiner said, that Kenneth and Doanita were his friends and that he did not know of any reason why they would lie.

As I stated in my special concurrence to the previous opinion (*People v. Young*, 323 Ill. App. 3d 1078-1092 (2001) (Theis, J., specially concurring)), the prosecution's practice of asking a criminal defendant to comment on the veracity of other witnesses who have testified against him has consistently and repeatedly been condemned by this court because such questions intrude on the jury's function of determining the credibility of witnesses and serve to demean and ridicule the defendant. *People v. Martin*, 271 Ill. App. 3d 346, 356 (1995); *People v. Morris*, 229 Ill. App. 3d 144, 168 (1992); *People v. Robinson*, 219 Ill. App. 3d 235, 239 (1991); *People v. Nwadiei*, 207 Ill. App. 3d 869, 876-77 (1990); *People v. Matthews*, 205 Ill. App. 3d 371,

414-15 (1990); *People v. Mitchell*, 200 Ill. App. 3d 969, 978 (1990); *People v. Foster*, 190 Ill. App. 3d 1018, 1029 (1989); *People v. Barnes*, 182 Ill. App. 3d 75, 85-86 (1989); *People v. Hopkins*, 107 Ill. App. 3d 422, 426 (1982); *People v. Dowd*, 101 Ill. App. 3d 830, 844 (1981); *People v. Best*, 97 Ill. App. 3d 1083, 1086-87 (1981); *People v. McGee*, 88 Ill. App. 3d 447, 453 (1980); *People v. Cohen*, 83 Ill. App. 3d 706, 708 (1980); *People v. Bost*, 80 Ill. App. 3d 933, 946-47 (1980); *People v. Moore*, 80 Ill. App. 3d 996, 1005 (1980); *People v. Hainline*, 77 Ill. App. 3d 30, 33 (1979); *People v. Robinson*, 67 Ill. App. 3d 539, 550-51 (1978); *People v. Spates*, 62 Ill. App. 3d 890, 893-94 (1978); *People v. Riley*, 63 Ill. App. 3d 176, 184-85 (1978); *People v. Meeks*, 11 Ill. App. 3d 973, 979-80 (1973); *People v. Hicks*, 133 Ill. App. 2d 424, 434 (1971).

While this practice has generally been deemed harmless error where evidence of defendant's guilt was overwhelming, here, as discussed above, the evidence was closely balanced and the credibility of the witnesses was a crucial factor underlying the jury's determination of defendant's guilt or innocence. Further, the State compounded this error by arguing during closing arguments that the jury should find the State's witnesses, and not defendant, credible, leading to a guilty verdict. He also referred to his questions to defendant as "trick questions" and stated that the State's witnesses had "no motive to lie." In light of the State's numerous instances of prosecutorial misconduct, this court's repeated condemnation of this practice, and the closely balanced evidence in this case, the State's questioning of defendant with respect to the veracity of adverse witnesses was not harmless error. Accordingly, I concur with the result of the majority in reversing and remanding the judgment of the circuit court.

JUSTICE GREIMAN, dissenting:

The majority has chosen to address most[1] of defendant's claims of prosecutorial misconduct and ineffective assistance of counsel under the plain error rule (134 Ill. 2d R. 615(a)). As the majority notes, a court may review otherwise unpreserved error under the plain error rule where "(1) the evidence in a criminal case is closely balanced or (2) the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process." *People v. Johnson*, 208 Ill. 2d 53, 63-64 (2003). In concurring with the jury's verdict, I believe the majority is correct in finding that the evidence was not so closely balanced factually that the alleged ineffective as-

---

[1]In his brief, defendant alleges 27 errors, yet has properly preserved only 4 of these alleged errors for review.

sistance of counsel and prosecutorial error could have altered the outcome of this case.

However, I also believe that none of the alleged errors, whether taken individually or cumulatively, preserved or unpreserved, constitute reversible error. The majority holds that the cumulative effect of the prosecution's improper questioning of the defense witnesses, its misstatement of the burden of proof, its improper vouching for certain witnesses, and its comments regarding the defendant's postarrest silence and his prior criminal background deprived defendant of a fair trial. In addition, it finds defendant's counsel ineffective for failing to make timely objections and for indicating "that he lacked the requisite expertise to appropriately cross-examine experts on their opinions," thereby bolstering those opinions. 347 Ill. App. 3d at 928. I respectfully disagree.

As noted in my dissent to the majority's previous opinion (*People v. Young*, 323 Ill. App. 3d 1078, 1095-96 (2001) (Greiman, J., dissenting)), most of the errors of which defendant complains have been found by Illinois courts not to constitute reversible error when found to have as limited an impact on the proceedings as I believe these alleged errors have in the present case. See, *e.g.*, *People v. Turner*, 128 Ill. 2d 540, 557 (1989) (queries regarding why another witness testified as he did held to be proper); *People v. Riley*, 63 Ill. App. 3d 176, 184-85 (1978) (questioning of another witness's veracity held improper, but generally not reversible error); *People v. McKinley*, 242 Ill. App. 3d 124, 131-32 (1992) (prosecutor's comment on defendant's failure to produce an expert held to be proper where prosecutor does not assert that defendant had an obligation to prove the expert wrong); *People v. Pecoraro*, 144 Ill. 2d 1, 16 (1991) (comment that the jury's disbelief in certain witnesses will lead to a not-guilty verdict held to be proper where the prosecution's version of the incident varies substantially from the version given by the defense); *People v. Bailey*, 249 Ill. App. 3d 79, 82 (1993) (holding that it is not error *per se* for a prosecutor to use the first person in addressing the jury); *People v. Hall*, 194 Ill. 2d 305, 339 (2000) (holding that although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different); *People v. Buss*, 187 Ill. 2d 144, 245-46 (1999) (holding that counsel was not ineffective where defendant has not demonstrated prejudice resulting from his counsel's failure to object to the portion of the argument at issue); *People v. Steading*, 308 Ill. App. 3d 934, 939 (1999) (holding that counsel is not ineffective where defendant has not demonstrated how any further investigation of the witness would have changed the

outcome of the case); and *People v. Harris*, 182 Ill. 2d 114, 158 (1998) (holding that defense counsel's admission of his own ineffectiveness is not determinative of the issue).

However, I was initially inclined to agree with the majority that the prosecution committed reversible error in questioning defendant about his postarrest silence, thereby violating the due process clause of the fifth amendment. U.S. Const., amend. V. The case relied upon by the State in its motion to cite additional authority, *People v. Colts*, 269 Ill. App. 3d 679 (1993), has convinced me otherwise. There, the prosecutor asked defendant when he first told anyone about his alibi. On appeal, defendant contended that question drew attention to his postarrest silence, in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). We held:

> "The prosecutor did not ask about defendant's silence during police questioning; instead, the prosecutor's question covered many conversations with private parties over an extended period of time. In the months prior to trial, defendant had ample opportunity to discuss his case with counsel and others, under circumstances in which a person would normally mention where he had been, if he had not been at the crime scene. The trial court properly overruled defendant's objection to the question." *Colts*, 269 Ill. App. 3d at 692.

Because the prosecutor's query in the present case, "[s]o the first time you are telling anybody about that [the self-defense theory] is today here," is indistinguishable from that in *Colts*, I believe that controlling case law compels a finding that no *Doyle* violation occurred.

With respect to *People v. Johnson*, 208 Ill. 2d 53 (2003), I do not find, in the case at bar, the kind of "pervasive pattern of error engendered by prosecutorial misconduct" that was in *Johnson*. Much of the objectionable matter in *Johnson* related to the suggestion by the State that defendants did not testify. Here, defendant testified, so that his right to remain silent was not in question. Similarly, we are not presented with the State's closing argument which attempts to steer prejudice and outrage so as to direct the jury's attention to an inappropriate consideration of the evidence. I find that none of the alleged errors, as previously discussed, rise to the level of grave, reversible error. Consequently, I disagree that plain error may be used to sidestep the general rule of waiver outlined in *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). I respectfully dissent.