No. 2--99--0556

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Kane County.

)

Plaintiff-Appellee, )

) 

v. ) No. 94--CF--2373

)

KENNETH R. SMITH, ) Honorable

) Philip L. DiMarzio,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Kenneth R. Smith, was charged by indictment with three counts of first-degree murder (720 ILCS 5/9--1(a)(1),(2),(3) (West 1994))  and one count each of armed violence (720 ILCS 5/33A--2 (West 1994)), unlawful possession of a weapon by a felon (720 ILCS 5/24--1.1(a) (West 1994)), and armed robbery (720 ILCS 5/18--2(a) (West 1994)).  After a bench trial, defendant was convicted of three counts of first-degree murder and one count of armed robbery.  The trial court denied defendant's motion for a new trial.  The State sought the death penalty, and the trial court found defendant eligible for the death penalty.   Following a capital sentencing hearing, the trial court sentenced defendant to natural life in prison without parole.  After the trial court denied defendant's motion to reconsider his sentence, defendant filed a timely notice of appeal.  On appeal, defendant argues that (1) the trial court erred in admitting certain statements pursuant to the coconspirator exception to the hearsay rule, (2) the State did not prove him guilty beyond a reasonable doubt, and (3) his sentence was excessive.

Before addressing the merits of defendant's appeal, we feel compelled to comment on the course of the proceedings related to defendant's motion to reconsider his sentence.  Defendant was sentenced on September 13, 1996.  On October 11, 1996, defendant's attorney (a public defender) filed a motion to reconsider the sentence.  The motion to reconsider was not heard until almost three years later, on May 6, 1999.  It appears from the record that the delay was due to the public defender's failure to notice the motion for hearing.  On May 6, the public defender advised the court that the motion had been continued "several times over the years" and that during that time the public defender had been searching for the victim's real killer.  The record, however, indicates that the motion to reconsider was noticed for hearing for the first time on March 12, 1999.  The court continued the hearing on the motion twice and heard the motion on May 6, 1999.  

The failure to notice for hearing defendant's motion to reconsider sentence until almost three years after it was filed is unacceptable. The public defender's purported search for exculpatory evidence, even if true, is no excuse.  The Kane County public defender's office should make every effort to prevent such delays from occurring in the future.

We turn now to the relevant facts.  The record reveals that the State filed a motion 
in limine
 to determine whether statements made by codefendants would be admissible under the coconspirator exception to the hearsay rule.  The trial court ruled that it would hear foundational evidence during the trial and then determine whether the State sufficiently established a conspiracy.  At the close of the State's case, defendant moved to strike certain testimony regarding coconspirator statements on the ground that the State failed to prove a conspiracy.  The trial court denied the motion to strike and ruled that the State met its burden of establishing a conspiracy. 

The evidence at trial revealed that, on December 12, 1994, Chris Jackson was shot five times and killed in apartment 16 of the Fox View Apartments in Carpentersville.  The shooting occurred at approximately 4 a.m.  According to Jackson's girlfriend, Sabrina Peachey, Jackson was a drug dealer.  Peachey lived at the Fox View Apartments.  At about 1 a.m. on December 12, Jackson brought Peachey and her children from Chicago to her apartment. 

Peachey testified that Jackson left her apartment about 15 minutes after they arrived there, and he returned about 15 minutes later.  He and Peachey talked for a while.  The last time Peachey saw Jackson that evening was about 3:30 or 3:45 a.m.  Peachey testified that she heard Jackson's friend "Lo" knock on the door, but she did not see him because she was in the kitchen.  Peachey testified that Jackson left the apartment with Lo.   That evening Jackson was wearing two gold necklaces and five rings, two of which were diamond rings.  Peachey also testified that she saw Jackson with “wads of money” in her apartment.

   Cherrell Jackson (Cherrell), defendant's girlfriend, testified that, at approximately 9 p.m. on December 11, 1994, codefendant Terry Madden came to see defendant at Jackson's home in Chicago.  Madden and defendant talked behind closed doors for about 15 or 20 minutes.  Cherrell testified that Madden was in a hurry and was nervous and agitated as he waited for defendant to get dressed.  Cherrell asked defendant what was going on, but defendant said he did not want to talk about it because it was Madden's business.  Madden told Cherrell that he had won $3,000 in the lottery and wanted defendant to go with him to pick up his money.  Defendant, who was wearing a green army fatigue jacket, left with Madden and did not return to Cherrell's house that night.

Charmaine Logwood testified that, on December 12, 1994, she lived in apartment 16 at the Fox View Apartments.  Logwood's boyfriend, Lorenzo Wright, also stayed there frequently.  Late in the evening of December 11, Terry Madden and a man Logwood did not recognize came to her apartment to talk to Wright.  The unknown man wore a green army fatigue coat and dark pants.  He, Madden, and Wright went into Logwood's bedroom for 15 to 20 minutes.

After Madden and the unknown man came out of the bedroom, they left the apartment.  Logwood and Wright discussed whether Wright would take Logwood's only apartment key with him.  Wright left with the key.  Before Logwood went to bed, she looked out of her window and saw Madden and the unknown man "walking the neighborhood." 

While she was sleeping, Logwood heard a knock on her window.  When she looked out of the window, she did not see anyone.  Logwood went back to sleep and woke up later when she heard a key in the apartment door.  Next, she heard scuffling noises coming from the front room followed by gunshots, more scuffling noises, and more gunshots.  Logwood hid in her bedroom closet.  While in the closet, she heard a voice say, "Get his rings."  Logwood initially stated that she did not remember whose voice she heard, but then testified that she recalled giving a statement in which she said it was Madden's voice she heard.  On cross-examination, Logwood said she was sure it was Madden's voice.

After the gunshots, Logwood stayed in her closet for 10 to 15 minutes.  When she came out, Logwood looked in the living room and saw the victim, Jackson, on the floor.  Then she and her daughter, who was sleeping in the other bedroom, climbed out of a back window and went to a neighbor's apartment.

Logwood testified that she was a drug addict.  The last time she used drugs was on the night of the shooting.  She testified that she used a little cocaine that night but it did not affect her ability to recall.  Logwood received use immunity for cocaine that was found in her apartment on the night of the shooting.  The State's Attorney and Carpentersville police assisted Logwood with some pending traffic charges.  Also, the police helped her move to a new apartment after the shooting.

Lorenzo Wright testified that he had been charged with the murder and armed robbery of Jackson and that he was testifying against defendant pursuant to an agreement with the State.  The agreement provided that the State would drop the murder charge and that Wright would receive a sentence of 12 years' imprisonment on the armed robbery charge and a concurrent sentence of 12 years for violating his probation for a conviction in Cook County of possession of cocaine with intent to deliver.  Wright further testified that he was a heroin addict.  He had used heroin during the early morning hours of December 12, 1994, prior to Jackson's murder.  Wright stated that his drug usage did not affect his ability to think straight. 

Wright testified that his nickname was "Lo."  He had known Jackson for eight months to a year before the shooting.  They had sold drugs together.  Terry Madden, whom he had known for about two years prior to the shooting, was also Wright's good friend.  On December 11, 1994, Wright saw Madden and another friend, Paris LeFlore, at the Fox View Apartments.  A "skinny, light skinned person" wearing a camouflage army jacket was with them.  LeFlore and Madden introduced this person as Ken.  The four men talked and sold drugs.  After a while, Wright left.  Later, he met up with Madden and defendant at Charmaine Logwood's apartment.  They smoked "weed and primos" in Logwood's bedroom.  According to Wright, while they were in the bedroom Madden said, "Lo, let's get Chris."  Madden said that defendant could "get" Jackson because Jackson did not know him.  Wright testified that he agreed to take part in the plan to rob Jackson, but denied knowing that anyone was going to shoot him.

After the discussion, Madden and defendant left.  Wright stayed in the apartment for about one hour.  Then, he got the apartment key from Logwood and left.  Wright testified that he went to Sabrina Peachey's apartment because Jackson had said he would be there.  Wright and Jackson stayed at Peachey's apartment for 20 to 25 minutes, then went to "Janet's " apartment.  At Janet's they watched television, ate, and snorted heroin.  Wright testified that they left Janet's apartment to go sell drugs in the apartment complex.  They stopped at Peachey's apartment to make a phone call.  Then they left Peachey's apartment and walked toward Logwood's apartment.   

Wright testified that they saw defendant on the sidewalk in front of Logwood's apartment.  Defendant asked Jackson if he had any "40's," which Wright described as a package of cocaine.  Jackson said, "What you need, I got."  At that point, Wright walked down the steps toward Logwood's basement apartment.  As he put the key in the door and turned the lock, he heard "a roughness" behind him.  Wright testified that he turned around and saw defendant pointing a ".380 automatic" at Jackson.  Jackson tried to run away from defendant and into Logwood's apartment.  Wright testified that defendant fired the gun twice as Jackson ran for the door.  Jackson fell as he entered the apartment.  Defendant followed Jackson into the apartment and told him to get on his knees and give him all of his jewelry.  Wright went back to the top of the stairs, turned, and looked into the apartment.  He saw Jackson standing up facing defendant.  Next, Wright heard a "pop" and saw smoke coming from Jackson's head.  Jackson fell, and Wright walked to the corner of the building.  While he was standing on the sidewalk, Wright heard Madden say, "Did you get the rings, did you get the jewelry?"  Later Wright testified that he did not see Madden during the incident.

Wright testified that, after the shooting, Paris LeFlore and his girlfriend ran out of LeFlore's apartment.  Wright, Madden, and defendant got in LeFlore's car, and LeFlore drove them to Chicago.  Wright saw defendant with rings and money, which he was counting.  When they arrived in Chicago, defendant divided the money and jewelry, keeping some for himself.

Wright fled Illinois after the incident and went to New York City.  He testified that he went there for rehabilitation.  On March 7, 1995, at a New York City police station, Carpentersville detectives questioned him about the murder.  Wright testified that he lied during the questioning because he was nervous and shaky, but also because he wanted to protect himself.  He told Carpentersville detective Timothy Bosshart that the "light skinned guy" was shooting at him. 

Cherrell Jackson, defendant's girlfriend, testified that in the days following the shooting she exchanged numerous phone calls with defendant.  During one of the phone calls, defendant said that he was hiding out and did not want anyone to know where he was.  On December 16, defendant appeared at Cherrell's house and spent the night.  The following day, defendant told Cherrell that he and Madden had gone to Carpentersville to stick up a drug dealer.  Defendant said that he thought the drug dealer had a gun, so he shot him four times.  Defendant also said that he did all the work but had to split the money with LeFlore and Madden.  Defendant said they got $1,000 and a ring.

A couple of days after this conversation, Cherrell told defendant that she did not want him to stay at her house.  Defendant threatened to kill her and refused to leave.  A couple of days later, Cherrell told a friend, Glenn Morris, what was happening with defendant.  That night, Morris and Terry Crawford, the father of one of Cherrell's children, went to Cherrell's house.  They planned to tell defendant that he had to leave.  

Defendant arrived at Cherrell's house at about 1 a.m.  Cherrell told defendant that he had to leave, and Morris escorted him to the bedroom to retrieve his belongings.  During this time, defendant threatened to kill Cherrell, her children, and her mother. Defendant repeated these threats several times before he left the house.  Cherrell testified that defendant said that he had just killed someone in Carpentersville so killing someone else would not mean anything to him.  

Glenn Morris testified that he had a 15-minute conversation with defendant during which defendant said that he had shot and killed someone in Carpentersville and that he had taken a ring from the victim's finger and $1,000 from his pocket.  

Carpentersville police sergeant Jerry Ford testified that he interviewed defendant on December 22, 1994.  Defendant told Ford that he was present when the shooting took place.  He said that "two guys" brought Jackson into the apartment and the shooting took place. Defendant then drove Paris LeFlore, LeFlore's girlfriend, and Terry Madden from the scene.  Defendant said that on December 11 he had spent time with LeFlore and Madden at an apartment near the one where the shooting occurred.  LeFlore asked defendant to commit an armed robbery of Jackson.  Defendant asked for $1,000 in return for robbing Jackson.  LeFlore and defendant argued and defendant refused to rob Jackson.  Defendant told Sergeant Ford that he did not know Jackson, but he knew that Jackson was a flashy dresser who wore a lot of jewelry. 

Detective Timothy Bosshart of the Carpentersville police department testified that he interviewed defendant twice regarding the murder.  On the first occasion, defendant said that he knew Terry Madden but did not know Paris LeFlore.  When asked whether he was involved in Jackson's murder, defendant said that he did not shoot anybody.  Defendant also said that he was "right in the middle of it."  Defendant stated that a witness would be able to pick him out of a lineup but that he did not shoot anybody.

The next day Bosshart questioned defendant again.  This time defendant acknowledged that he knew Paris LeFlore.  When asked if he had ever been to Carpentersville, defendant initially said "no," but then he said he may have been there years ago.  Later, he said that he may have been there the night before the shooting.  Bosshart asked defendant again if he was involved in the shooting.  Defendant replied that "sometimes a person might just be driving and may know that the people he is with are there to take care of business and then the person hears shots." 

Bosshart testified that he prepared a photo lineup that  included a photograph of defendant.  He presented the lineup to Charmaine Logwood on December 22, 1994.  Logwood did not positively identify anyone but said that defendant's picture resembled the skin color and facial structure of the man she saw in her apartment.   

At the conclusion of the trial, the court found defendant guilty of three counts of first-degree murder and one count of armed robbery.  The trial court denied defendant's motion for a new trial and his motion to reconsider his sentence.

Defendant's first argument on appeal is that the trial court erred in admitting hearsay statements under the coconspirator exception to the hearsay rule.  Under this exception, any declaration by one coconspirator is admissible against all conspirators where the declaration was made during the pendency of and in furtherance of the conspiracy.  
People v. Kliner
, 185 Ill. 2d 81, 141 (1998).  Coconspirator statements are admissible upon an independent, 
prima facie
 evidentiary showing of a conspiracy or joint venture between the hearsay declarant and the defendant.  
People v. Testa
, 261 Ill. App. 3d 1025, 1027 (1994).  Defendant contends that the State did not provide sufficient independent evidence to establish a conspiracy.

In ruling that the State met its burden of making a 
prima facie
 showing of a conspiracy, the court noted Cherrell Jackson's testimony that Terry Madden came to her house on the night of the shooting and met with defendant behind closed doors,  defendant hurriedly got dressed and was wearing a green army fatigue coat when he left, and defendant refused to give Cherrell any information about what was happening.  The court found Cherrell to be a credible witness.  

Additionally, the court relied on Charmaine Logwood's testimony that a man wearing a green army fatigue coat met with Lorenzo Wright and Terry Madden in her apartment on the night of the shooting.  The court also noted that Logwood picked out defendant's picture from a lineup as someone with a similar complexion and facial structure to the man she saw in her apartment with Madden and Wright.

The court further relied on defendant's statements that he met with Paris LeFlore and discussed an armed robbery; drove Madden, LeFlore, and LeFlore's girlfriend from Carpentersville to Chicago after the shooting; and split Jackson's money with the other individuals involved. 

Defendant argues that it was improper for the trial court to rely on statements defendant made after the shooting when deciding whether the State successfully established a conspiracy.  Citing 
People v. Eddington
, 129 Ill. App. 3d 745 (1984), defendant argues that "post-conspiracy statements may not be used as independent evidence of the existence of a conspiracy."  We find no such holding in 
Eddington
.  The court in 
Eddington
 held that the codefendants' postconspiracy taped confessions implicating the defendant were not admissible under the coconspirator exception.  
Eddington
, 129 Ill. App. 3d at 771-75.  The court did not consider whether a defendant's postconspiracy statements could be used as independent proof of a conspiracy.  We are aware of no case that has prohibited the consideration of a defendant's own statements when determining whether the State sufficiently established a conspiracy.  Such a holding would contradict the well-established doctrine that the existence of an agreement between coconspirators to do a criminal act may be inferred from all of the surrounding facts and circumstances, including the acts and declarations of the accused.  See 
Testa
, 261 Ill. App. 3d at 1028.  Thus, the trial court properly considered defendant's statements as evidence of the conspiracy.

After a careful review of the record, we conclude that the trial court correctly determined that the State met its burden of making a 
prima facie
 showing that defendant was involved in a conspiracy to rob Jackson.  The evidence the court cited was sufficient independent evidence of a conspiracy.  Accordingly, the trial court did not err in admitting statements of defendant's coconspirators under the exception to the hearsay rule.   

Defendant's second argument is that the State did not prove him guilty beyond a reasonable doubt.  Defendant attacks the credibility of witnesses Lorenzo Wright, Cherrell Jackson, and Glenn Morris.  It is well established that, upon a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt.  
People v. Daniel
, 311 Ill. App. 3d 276, 282 (2000).  It is equally well established that our standard of review is one of great deference to the trier of fact; it is not our function to retry the defendant.  
Daniel
,  311 Ill. App. 3d at 282.  Rather, the witnesses' credibility and the weight to be given their testimony are determinations exclusively within the province of the trier of fact.  
People v. Wittenmyer
, 151 Ill. 2d 175, 191 (1992).

 Defendant has not convinced us that we should disregard the trial court's assessment of the witnesses' credibility or its ultimate finding that defendant was guilty beyond a reasonable doubt.  We note at the outset that defendant's argument on this issue consists primarily of unsupported speculation and is almost completely devoid of citation to the record.  We will not reverse a defendant's conviction simply because he claims that a witness was not credible.  
People v. Smith
, 177 Ill. 2d 53, 74 (1997).     We recognize defendant's contention that the testimony of an accomplice should be viewed with caution.  See 
Smith
, 177 Ill. 2d at 74.  Additionally, the testimony of a drug addict may be viewed with suspicion.  
People v. Steidl
, 142 Ill. 2d 204, 226-27 (1991).  However, accomplice testimony, whether corroborated or uncorroborated, is sufficient to sustain a conviction if it convinced the trier of fact of the defendant's guilt beyond a reasonable doubt.  
Smith
, 177 Ill. 2d at 74.  Likewise, the testimony of a drug addict may be enough to sustain a conviction if it was credible in view of the surrounding circumstances.  
Steidl
, 142 Ill. 2d at 226-27.     

Lorenzo Wright was both an accomplice and a drug addict.  Wright's testimony that defendant was the shooter was corroborated by Cherrell Jackson and Glenn Morris, who both testified that defendant said that he had shot someone in Carpentersville.  While defendant attacks Cherrell's and Morris's credibility, the trial court expressly found Cherrell to be credible.  There is nothing in the record that causes us to disagree with that assessment or to conclude that Morris was not a credible witness.   Further, the trial court knew of Wright's drug addiction and his status as an accomplice.  It was up to the trial court as the fact finder to assess Wright's credibility in light of these facts.  Defendant has not presented any reason why we should disturb the trial court's determination.  Looking at all of the evidence, it is clear that any rational trier of fact could have found the essential elements of the offenses of first-degree murder and armed robbery beyond a reasonable doubt.    

Defendant's final argument is that the trial court abused its discretion in sentencing him.  The trial court determined that defendant was eligible for the death penalty but, after hearing evidence pertaining to aggravation and mitigation, sentenced him to life in prison.  When explaining its decision not to impose the death penalty, the court stated that while defendant's crime was very brutal and heinous it fell short of exceptionally brutal and heinous behavior indicative of wanton cruelty.  The court also found defendant's relationship with his son to be a mitigating factor sufficient to preclude the imposition of the death penalty.

When determining what sentence was appropriate, the court considered the mitigating factors listed in section 5--5--3.1 of the Unified Code of Corrections (730 ILCS 5/5--5--3.1 (West 1994)) and found that none of them applied.  The court noted defendant's history of committing violent crimes, his inability to deal with his drug addiction, and the likelihood that he would commit more crimes.  In aggravation, the court noted defendant's significant criminal history, including another armed robbery and a carjacking, and his threats to kill his girlfriend and her family.  The court also believed that it was unlikely that defendant could be rehabilitated.

A trial court's determination regarding the length of a defendant's sentence will not be disturbed unless the trial court abused its discretion or relied on improper factors when imposing a sentence.  
People v. Morgan
, 306 Ill. App. 3d 616, 633 (1999).  The trial court's sentencing decision is afforded great weight because it depends upon the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.  
People v. David
, 141 Ill. App. 3d 243, 264 (1986).

Defendant does not argue that the trial court relied upon improper factors.  He contends that he was merely present at the scene of the offense and was not guilty of murder.  As we explained above, we disagree.  There was ample evidence to support the trial court's guilty verdict.  Thus, we reject this argument.

Defendant also argues that he should have received a sentence similar to his codefendants' sentences.  He alleges that codefendant Lorenzo Wright was sentenced to 12 years in prison for armed robbery, and Terry Madden received a 15-year sentence for armed robbery.  As information regarding his codefendants' sentences was not part of the record on appeal, we cannot consider these allegations.  Further, even assuming that the codefendants' sentences are accurately represented, we would find no reversible error in the disparity between defendant's sentence and those of his codefendants.  The evidence at trial revealed that defendant was the person who shot and killed Chris Jackson.  Further, defendant had a significant and violent criminal history and showed no remorse for killing Jackson.  The trial court carefully considered all of the relevant factors in determining defendant's sentence.  We find no abuse of discretion.

For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

GEIGER and HUTCHINSON, JJ., concur.