2021 IL App (1st) 172827-U

FIRST DIVISION
March 22, 2021

No. 1-17-2827

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. |
| | ) | |
| KEVIN MCINNIS | ) ) | Honorable Joan Margaret O'Brien, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
JUSTICES HYMAN and COGHLAN concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant was proven guilty beyond a reasonable doubt.  The trial court did not err in allowing prior consistent statements.

¶ 2    Following a jury trial, defendant, Kevin McInnis, was convicted of  two counts of aggravated kidnapping, one count of armed robbery, and one count of home invasion. On appeal, he argues that the State failed to prove him guilty beyond a reasonable doubt and that the trial

court erred in allowing consistent statements to be introduced. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4      On December 20, 2013, the victim, Z.S., was living on South Honore with her family. She was a 17-year-old senior in high school. She usually drove to school, leaving around 7:15 a.m., and picking up some friends along the way.

¶ 5      Shortly after 7 a.m., the victim was getting ready to leave for school. She had her book bag and her work bag with her. Her car was parked on the side of her house. As she was leaving through the back door, she saw a man standing by her next-door neighbor's porch. She did not pay any particular attention to this man because her neighbor had sons and she thought that this man might have been a friend of one of their sons.

¶ 6      As she locked the back door, she heard her gate open. She was concerned that someone was trying to enter through the gate, so she tried to unlock her back door to get back inside her house. When she got the door unlocked, she heard someone tell her, "You might as well open it back up." She did not turn around at that point because she was focused on the gun that was on the side of her head.

¶ 7      She walked back into her house through the back door. Inside the back door, there was a landing that led upstairs to the kitchen and downstairs to the basement. The man walked behind her into the kitchen and told her to put her bags down and give him her cell phone. The man asked her who was inside the home, and she told him no one. The man then forced her into the

bedroom that the victim shared with her sister. The victim turned on the bedroom lights, and she complied with the man's demand to sit on her sister's bed.

¶ 8     While sitting on the bed facing the man, she was able to get a full, frontal view of him and his gun.  He was wearing light blue jeans, a red coat, a black hoodie, a backpack, knit gloves, and some sort of mask on his face. The mask was cut out around the eyes and the mouth so she could see the area roughly halfway up his nose, to a little past his eyebrows, and the upper lip and mouth area. She identified defendant as the man with the gun in open court.

¶ 9     The victim started to cry because she was really scared. Defendant told her to stop crying because he was not going to touch her. Defendant told her to show him the rest of the house and waved his gun in whatever direction he wanted her to go. Defendant pointed the gun towards the victim's mother's bedroom. The victim turned on the light but stood in the doorway while defendant looked around.  He looked in a nightstand drawer and found a can of mace.  He removed it, chuckled, and said, "Not me."

¶ 10    Defendant  then directed the victim to the basement.  The basement consisted of a sitting area with couches and a television, her stepfather's office, and a bathroom.  Defendant told her to sit on the stairs while he looked around. After he was finished looking around, he directed her back upstairs. When they got back upstairs, defendant directed her to return to her bedroom, where he took her sister's iPad and Play Station 4 gaming system and put it inside his backpack. He then forced her back to her mother's room and took her mother's digital camera and a dish with loose change and dumped it into his backpack.

¶ 11    Afterwards, defendant forced the victim to sit on a chair at the dining room table and instructed her to enter the password into her mom's laptop.  She could not remember the

password because she was too scared. Defendant also asked the victim for the password to her cell phone and her sister's iPad, and he wrote them down.

¶ 12     Defendant looked through the victim's book bag and her work bag. He asked her where she worked. She told him that she worked at Jewel but gave him the address to a different store. He asked her about the whereabouts of her grandmother, and she told him that her grandmother lived with them every other weekend. He also asked about her mother, and the victim told him that her mother was at work.

¶ 13     During the time that defendant was forcing the victim around her house, the victim's best friend was trying to call the victim on her cell phone. Defendant eventually made the victim answer her phone and tell her friend that she was going to be a little late. At this point, defendant had been inside her home for a little over an hour.

¶ 14     Defendant then directed her back to the basement and told her to sit on the stairs, because he had to use the bathroom  Defendant told the victim "not to try anything" while he went inside the bathroom. Afterwards, he told her to sit on the couch in the television area while he looked at their Nintendo Wii games. He told the victim that he did not want to take them because it looked like they played these games often. The victim told him that he could have them and defendant said, "I'm going to need another bag." The victim retrieved her sister's drawstring bag with her sister's name on it. She chose that bag because she thought that it would assist in helping to identify the things that were taken from her house. As they were walking, defendant walked past a small bar cart in the victim's dining room. He took a bottle of alcohol and said, "[t]his is for me." She responded, "[]sn't this all for you?" Defendant laughed, waved his gun,

and said, "[y]ou're funny. I like that." They returned to the basement, where defendant took the Nintendo Wii.

¶ 15     Defendant then told the victim that he was about to leave. He instructed her to sit on the basement stairs. Once she was seated, he looked at her and asked her if she believed in God and if she went to church. The victim said that she did. He responded, "[s]o, I'm going to pay, huh?"

¶ 16     Defendant then told the victim to go upstairs with him and leave the house with him. Before they walked out through the back door, defendant hugged the victim and grabbed her buttock. Defendant was one to three inches away from the victim's face. Defendant then made her walk through the back of the house with him and through the alley behind her house. The victim got into her car and drove to her best friend's house. She called the police from her friend's house, and she told the officer what had happened. She gave a report to a female officer, who came to her house.

¶ 17     The next day, December 21, 2013, the victim was at home with her mother and her sister. Her sister yelled from inside her bedroom that "the robber's on my phone." When the victim and her mother rushed into the room, the sister showed them her cell phone, and it had screen shots of photos taken from her iPad. The victim took those photos from her sister's cell phone and put them onto a computer screen to enlarge them, but she did not recognize the person in the photos. One of the photos had a username or social media "handle" on it. From that information, the victim and her family members were able to find the real name of the person that she saw in those photos, Michael McInnis. The victim then viewed Michael McInnis' Facebook page, which contained photos of him. He was not the person who had robbed her. However, while

looking through Michael McInnis' Facebook page, she eventually saw a photo of defendant, the person who robbed her.

¶ 18    The victim printed out the photos that were taken with her sister's iPad and took them to the police station the next day. She did not print out any of the photos that she saw of defendant or any other photos of Michael McInnis from his Facebook page because she was scared. She told the officers that she thought that the person in the photos might be a relative of the person who robbed her.

¶ 19    Later, the victim got a call from the police, who told her to come back to the police station to view a line-up and see if she could identify the person who robbed her. She went to the police station with her mother, sister, and best friend. She read and signed a line-up warnings disclosure and then viewed a line-up, where she picked defendant because he was "the person that robbed her." She recognized that defendant was wearing the same jeans that he had worn when he robbed her, and she recognized his mustache, his "bushy" eyebrows, and his "old-looking" eyes. She could not tell defendant's hairstyle when he robbed her because he was wearing a hoodie. The person who was on these downloaded photos was not in the line-up. When she saw defendant in the line-up, she immediately recognized him as the person who robbed her.

¶ 20    On December 30, 2013, the victim was inside a courtroom at 111th Street and heard defendant's voice, which she immediately recognized it as the voice of the person who robbed her. While defendant was inside her home, she heard his voice many times, and described it as "kind of high pitched."

¶ 21    On December 22, 2013, Officer Cesar Candelario was working behind the front desk at the station when the victim turned over several photos. Officer Candelario was already aware

that the victim had reported a home invasion, armed robbery, and aggravated kidnapping. He recognized the individual in the photos as someone he knew from patrolling the area and subsequently learned his name was Michael McInnis. Officer Candelario did not recall whether the victim told him that the person in the photos was not the robber.

¶ 22    Officer Candelario and his partner, Officer Weatherly, went to the location where they believed that Michael McInnis was living. When they arrived, they saw Michael McInnis on the sidewalk in front of that home. The officers detained him and took him to the police station where he was informed of his *Miranda* rights.  Michael agreed to waive those rights and spoke with the officers.   As a result of that conversation, the officers returned to Michael's home to recover the proceeds from the robbery.

¶ 23    There, the officers met with Angela Harris, the mother of defendant and Michael McInnis. She signed a consent to search the home.  The officers went to the area of the home where Michael had told them they could find the proceeds of the robbery. The officers recovered the proceeds of the robbery under a chair by the furnace room, as well as a firearm from the basement, which the victim identified at trial as the firearm that defendant pointed at her head. Harris called defendant while the officers were still in the basement and they had a conversation about the proceeds of the robbery and the cell phone that he had in his possession. Officer Weatherly then spoke with defendant on the phone. After that conversation, the officers returned to the station to wait for defendant to turn himself in.  When defendant turned himself in, he had the stolen phone in his possession.

¶ 24    Michael McInnis testified that he was 24 years old, his date of birth was November 28, 1992, and defendant was his brother. In December of 2013, he was living on South Honore with

his mother, sister, and brother, Marcus, but defendant was not living there. Michael attended Youth Connection Leadership Academy, an alternative high school in Chicago.

¶ 25    On December 20, 2013, he came home from school in the afternoon, but denied that he saw defendant that day. He further denied or did not recall that defendant told him "he had got something." He also denied receiving any items, including an iPad and a digital camera that was removed from a gray Nike bag, that defendant showed him a gray Nike bag and that bag made a sound as if there was a bunch of change in it and that he took the iPad, turned it on, took a few photos with it, and then loaded these photos to Facebook and Instagram.

¶ 26    Michael did recall that he was arrested by Chicago police officers on December 22, 2013, but he did not recall having a conversation with the officers. He did not recall telling officer where they could find the robbery proceeds, that the robbery proceeds were given to him by his brother, and that they could find robbery items in the basement of their home. Michael did not recall speaking with a detective or ASA Hanichak. He did not recall composing a typewritten letter with the help of ASA Hanichak. He did not recall telling ASA Hanichak that he came home from school that afternoon and defendant was there. Defendant showed him a gray Nike bag and pulled out an iPad and a digital camera. He could hear the change "jangling" in the bag. The next day, he grabbed the iPad, turned it on, took a few photos, uploaded these photos onto Instagram and Facebook, and turned the iPad off.

¶ 27    Michael was shown his typewritten statement but stated that he did not recognize it. He did  acknowledge his signature on the statement. He also acknowledged some of the photos from the iPad that were introduced at trial, including ones of himself. He similarly did not recall telling ASA Hanichak that he had been treated well by the police, that he was offered food to eat and drink, that he was not handcuffed while providing his statement, that he made the statement

freely and voluntarily, that he was not under the influence of drugs or alcohol, that he could read and write English, demonstrating it by reading aloud the first paragraph of his statement, or that he was allowed to make changes to his statement.

¶ 28   ASA Hanichak testified that he was working in the felony review unit on December 23, 2013 and was assigned to assist in the investigation of this case. He spoke with the victim and Michael McInnis at the police station. After the victim viewed the line-up, ASA Hanichak interviewed the victim. She told him that the person in the photos she turned into the police was not the person who had come into her house and held her at gunpoint. He then interviewed Michael McInnis. At the conclusion of this conversation, Michael agreed to provide a written summary of the conversation. ASA Hanichak typed up the summary and then reviewed the statement with Michael by first asking him to read aloud the first paragraph to demonstrate that he could read and understand English. Then, they reviewed the rest of the statement together line by line, with ASA Hanichak reading it aloud. Michael was given the opportunity to make changes to it.

¶ 29   The statement was published to the jury and stated in relevant part: On Friday afternoon, December 20, 2013, he came home from school and defendant was at home. Defendant pulled out an iPad and a digital camera from a gray Nike bag. Defendant showed him the bag with the "stuff" and Michael could hear a lot of change "jangling" inside the bag. He did not look inside the bag. The next day, Michael grabbed the iPad, turned it on, took a few photos, and downloaded the photos onto Instagram and Facebook. Afterwards, Michael turned off the iPad. Michael stated that some of the photos he took were shown in court. Michael stated that he had been treated well by the police and ASA Hanichak, he was offered a drink, no threats or promises had been made to him to get him to make this statement, and he was making this

statement freely and voluntarily.  He was also not under the influence of drugs or alcohol at this time. Michael could read and write English and demonstrated it by reading the first paragraph of the statement aloud. He was then allowed to make corrections to the statement, and everything in the statement was true and correct.  Attached to the statement was a photograph taken of Michael at the police station.   At trial, Michael McInnis was shown the typewritten statement  and he acknowledged his signature.

¶ 30    The parties then entered into several stipulations.  Chicago Police Officer Mendiola-Kunis was an evidence technician and on December 20, 2013, she went the location of the crime and collected two swabs of biological material from the basement toilet. She submitted it to the crime lab in a sealed condition for potential future DNA analysis, and a proper chain of custody was always maintained.  Michael Pagan, an investigator with the Cook County State's Attorney's Office, collected a buccal swab from defendant's mouth. The swabs were sealed, inventoried, and submitted to the Illinois state police crime lab.   Elizabeth Sisler, a forensic scientist in the Forensic Science Section of the Illinois State Police Science Command, would be qualified as an expert in the field of forensic biology. She received the swabs that were used to collect possible cellular material from a toilet seat and preserved these swabs for future DNA analysis. Chicago Police Officer Bobby Weatherly arrived at South Honore pursuant to an investigation of an armed robbery, home invasion, and aggravated kidnapping. While there, he recovered a .357 caliber revolver with a defaced serial number. He inventoried the firearm in a sealed evidence bag. The revolver was transported to the Illinois State Police latent fingerprint unit for analysis and comparison.  John Gorski, a forensic scientist with the Illinois State Police, would be qualified as an expert in the field of fingerprint analysis, comparison, and identification based on his training and education, and would be qualified to render an expert opinion in the

field of forensic fingerprint identification. On August 21, 2014, he received a .357 caliber revolver along with four live cartridges, in a sealed condition. He analyzed the revolver and the live cartridges but did not find any latent print impressions suitable for comparison. Wendy Gruh, a forensic scientist at the Illinois State Police Science Center, and an expert in the field of forensic biology and DNA analysis, conducted a DNA analysis of the known buccal standard obtained from defendant. She also conducted a DNA analysis of the swab taken from the toilet seat. From the toilet seat, she was able to find a mixture of DNA profiles identified; a mixture of two people. She identified one female DNA profile and one additional DNA type. Because the DNA profile matched that of a female, and defendant was male, she did not conduct any further testing. She was unable to determine if the additional DNA type came from a male or a female. She compared it to defendant's buccal standard, and she could exclude defendant from that DNA type. As she explained, this did not mean that defendant did not have contact with the toilet seat, but that the more a person has contact with a surface, the more it would be likely for a transfer of DNA to occur onto that surface.

¶ 31    Defendant rested without calling any witnesses. The jury found defendant guilty of aggravated kidnapping while wearing a hood, robe, or mask (Count 2); aggravated kidnapping while armed with a firearm (Count 4); home invasion (Count 6); and armed robbery (Count 5). Defendant was sentenced to an aggregate of 31 years' imprisonment.

¶ 32    Defendant filed a motion to reconsider his sentence. In his motion, he argued that his sentence violated the one-act, one-crime doctrine where his conviction for aggravated kidnapping (with a mask or hood) is a second conviction carved out of the same act of kidnapping (with a firearm). The trial court denied this argument but reduced defendant's sentence to 28 years' imprisonment on the grounds that the original sentence was excessive.

¶ 33    Defendant now appeals his convictions and sentence.

¶ 34                            ANALYSIS

¶ 35    Defendant argues that the State did not prove him guilty beyond a reasonable doubt. Defendant argues that the victim's testimony, identifying defendant as the offender, was unworthy of belief and therefore insufficient to establish his guilt.

¶ 36    When the defendant challenges the sufficiency of the evidence, the reviewing court must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court affords great deference to the trier of facts and does not retry the defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). "[A] reviewing court must allow all reasonable inferences from the record in favor of the [State]." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *People v. Graham*, 392 Ill. App. 3d 1001, 1009 (2009).

¶ 37    It is within the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *Id.* It is not the duty of the trier of fact to accept any possible explanation that favors the defendant's innocence and "elevate it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 38    Here, defendant alleges that the identification testimony of the victim was insufficient to support his conviction. Illinois applies the following factors to assess identification testimony:

(1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307.

¶ 39    With respect to the first factor and second factors, the victim testified that she spent over an hour with defendant in her home. She got a full-frontal view of defendant when he forced her to sit on her sister's bed. Even though defendant had on a mask the holes in it were big enough that she could see the area roughly halfway up his nose, to a little past his eyebrows, and the upper lip and mouth area. She also had several conversations with defendant where they were face to face. She also was able to view defendant as they walked through the house, from room to room, while he looked for things to steal. In addition, right before defendant left, he was one to three inches away from her face as he gave her a hug and grabbed her buttock. The victim was clearly focused on defendant during the entire time they roamed about the house because he held her at gunpoint.

¶ 40    As to the third factor, at trial, the victim provided a thorough description of defendant to the police, including a description of what he was wearing. While defendant wore a mask when he was inside the victim's home, the mask was cut out so that she could see defendant's eyes and mouth. The victim testified that the mask did not interfere in any way with her ability to identify defendant.

¶ 41    As to the level of certainty demonstrated by the victim and the length of time between the

crime and the identification, the victim positively identified defendant in a physical line-up within three days of the crime. She testified that she picked defendant out of the line-up because he was "the person that robbed her." She noted that he was wearing the same jeans that he had worn when he held her at gunpoint and robbed her and also recognized his mustache, his "bushy" or "thick" eyebrows, and his eyes, which made him look "older." She also testified that defendant spoke a lot and she heard defendant's voice many times while he held her at gunpoint inside her home and that his voice was "kind of high pitched." She was able to identify his voice inside a courtroom several days after the offense. When she identified defendant as the offender at trial, she testified that she immediately recognized him as the offender, despite defendant's attempt to change his hair style. Finally, there were only three days between the offense until the victim identified defendant in the line-up. Clearly, the evidence established defendant's identity as the offender beyond a reasonable doubt.

¶ 42   Defendant also argues that the victim's identification was insufficient because there "was no physical evidence connecting [him] to the offense and the circumstances surrounding [the victim's] identification of him…" This argument completely ignores the other evidence against him, including the fact that when defendant turned himself into the police within days of the robbery, he had the victim's cell phone in his possession. See *People v. Housby*, 84 Ill. 2d 415, 423 (1981) (the recent unexplained possession of stolen property is a factor that may be considered in determining guilt).

¶ 43   Furthermore, defendant argues that there was conflicting testimony about who was the offender, Michael, or him. Defendant urges that Officer Candelario testified that when the victim came to the police station on December 22nd, she had several photographs in her possession and she told him that the person in the photos was the person who had robbed her.

14

However, Officer Candelario was later impeached by his own police report, which stated that he had "received information for Sixth District personnel..." and it did not say that he had interviewed the victim. In addition, the victim testified on cross-examination that the person in these photographs was not the offender. The jury, as the trier of fact in this case, had the opportunity to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *Graham*, 392 Ill. App. 3d at 1009. We will not substitute our judgment for that of the trier of fact. *Sutherland*, 223 Ill. 2d at 242.

¶ 44 Finally, defendant next argues that there was error in this case when the State improperly elicited prior consistent statements twice. Initially, on cross examination, the victim testified that Michael McInnis, the person depicted in the photograph that she gave to police, was not the person who robbed her in her home. Defendant claims that after the victim was impeached and without any evidence that she had a motive to lie, the State recalled her to testify to the same version and then called ASA Hanichak who also testified that the victim told him that the person in the photograph was not the person that robbed her. Defendant argues that he was prejudiced by the improper consistent statements because the jury erroneously heard three times that Michael was not the robber and only once that he was.

¶ 45 The State argues that defendant has forfeited this issue because defendant failed to include this issue in his posttrial motion. We agree. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (forfeiture occurs when a defendant fails to object at trial and fails to include an issue in his motion for a new trial). Defendant, however, urges us to review this issue for plain error.

¶ 46 The plain-error doctrine permits a court of review to consider error that has been forfeited when either,

"(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [Citation.] Prejudice to the defendant is presumed because of the importance of the right involved, 'regardless of the strength of the evidence.' (Emphasis in original.) [Citation.] In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

However, we must first determine whether an error actually occurred. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 47    During the direct examination of the victim, the victim testified that she took the photos that were taken with her sister's stolen iPad to the police station. The State asked her, "What did you tell the police about those pictures," and defense counsel objected on the basis of "[h]earsay. Prior consistent statement." The objection was sustained.

¶ 48    Later, during cross-examination, the following colloquy occurred:

"[DEFENSE COUNSEL]: Did you write down on the photographs themselves that the person depicted in these three photographs was not the person that robbed you?

[VICTIM]: I don't remember writing that down, but I told that to the police verbally.

[DEFENSE COUNSEL]: Who is the police officer that you told this to?

 [VICTIM]: I don't remember."

Defense counsel continued to cross-examine the victim as to the identity of the police officer that she spoke to, and asked the following:

"[DEFENSE COUNSEL]: But you remember telling him that that's not the robber?

[VICTIM]:  I remember telling a [sic] officer it wasn't the robber."

Then, during cross-examination of Officer Candelario, defense counsel asked him, "Did [the victim] tell you that she saw the robber at Michael McInnis' website?" Officer Candelario responded, "When she came to the station, she brought the picture saying that that was the guy that robbed her."

¶ 49    After Officer Candelario's testimony, the State requested to recall the victim as a witness. Defense counsel objected, and during a sidebar, the following colloquy occurred:

"[DEFENSE COUNSEL]: I just want to say that recalling her would be repetitive, Judge. She had a full and fair chance to speak and say anything she wanted to say. If there is something omitted or something she didn't talk about, we can cover that now, but I think that just calling her back to the stand would be repetitive.

[COURT]: Well, if it is going to be repetitive, I won't allow that, but I mean, the State is still in their case in chief. There is no rule I have ever heard of that you can't recall someone. Is it a little unusual? Yes, but if this were in your case and you asked me to recall a witness, I would let you do the same thing. State, did you want to say anything?

[PROSECUTOR]: Judge, based on what Counsel just drew out, when we asked in my direct examination of [the victim] one of the questions was "What did you tell the police when you were given that picture?" Counsel objected, it was sustained and now he's trying to get - - he's gotten the other half of the conversation in Officer Candelario. Based on that, there is clear indication that, during the cross of [the victim], as well as Officer

Candelario, of recent fabrication, that's why, among other things, why would [sic] we be calling her back.

I believe the exact objection by Counsel was prior consistent statements, and he just then opened the door. He objected, it was sustained. Now he's getting the same exact conversation just with the answer that he wants, and it also serves as impeachment for Officer Candelario.

[COURT]: As I said, I'll let the State recall the witness just to address those issues."

¶ 50 The State recalled the victim during which the following colloquy occurred, in pertinent part:

[PROSECUTOR]: When you went to the Police Department and you brought the three pictures of Michael, did you tell the officers there that this is the guy who robbed you?

[THE VICTIM]: No

[PROSECUTOR]: Why didn't you tell him the guy in the picture was the guy who robbed you?

[THE VICTIM]: Because I knew that wasn't who robbed me.

[PROSECUTOR]: Did you want to see the person who actually robbed you get caught?

[THE VICTIM]: Yes.

[PROSECUTOR]: What did you tell them you thought the guy that came over in the Cloud, what did you tell them?

[THE VICTIM]: I thought maybe he was a relative of him."

¶ 51 Later, ASA Hanichak testified during direct examination that he spoke to the victim before he spoke with Michael McInnis. Over an unspecified objection by defense counsel, ASA Hanichak then testified that the victim told him that the person in the photo given to the police

was not the person that had come into her house and held her at gunpoint.

¶ 52    Generally, a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness because they serve to unfairly enhance the witness's credibility. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. This rule, however, does not apply to statements of identification. *People v. Shum*, 117 Ill. 2d 317, 342 (1987); *People v. Tisdel*, 201 Ill. 2d 210, 217 (2002).  Section 115-12 of the Code of Criminal Procedure of 1963 (Code), titled "Substantive Admissibility of Prior Identification" provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2016).

¶ 53    We find that no actual error occurred here.  The testimony complained of amounted to prior statements of identification under section 115-12, not prior consistent statements. The victim testified at trial and was subject to cross-examination. The complained of testimony merely recounted steps in the identification process and, accordingly, are statements of identification. In addition, ASA Hanichak's testimony regarding the victim's prior consistent statements of identification also fall under the purview of section 115-12. See *Shum*, 117 Ill. 2d at 342 (holding that where a witness testifies that he previously identified an offender and that witness has been cross-examined, a third party may testify that he heard or saw that witness identify the offender). According to the supreme court:

> "The plain language of section 115-12 requires the declarant to testify and be subject to cross-examination on the identification statement. [Citation.] There are no other requirements for admission of a third party's testimony about the declarant's out-of-court

19

identification [statement]." *People v. Lewis*, 223 Ill. 2d 393, 402-03 (2006).

¶ 54    Because the witness's statements were properly admitted under section 115-12, no error occurred and plain error analysis is not necessary.

¶ 55                    CONCLUSION

¶ 56    For all the reasons stated herein, we affirm the judgment of the trial court.

¶ 57    Affirmed.